No. 31,780

THE STATE OF KANSAS, *Appellee,* v. W. W. FINNEY, *Appellant.*

(40 P. 2d 411)

 Opinion filed
January 26, 1935. 

*J. J. Schenck, Clyde P. Schenck, E. R. Sloan, W. Glenn Hamilton, F. A. Sloan, Eldon R. Sloan,* all of Topeka, *Owen S. Samuel, O. R. Stites,* both of Emporia, and *W. D. Jochems,* of Wichita, for the appellant.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, *Hugo T. Wedell,* special assistant attorney-general, and *Clarence V. Beck,* county attorney, for the appellee.

The opinion of the court was delivered by

SMITH, J.: The defendant was convicted in twelve counts of a violation of R. S. 1933 Supp. 9-140. He appeals.

At the time of the trial and for some years prior thereto defendant was a director and president of the Fidelity State and Savings Bank of Emporia. He owned a majority of the stock in this bank. He was also president and general manager of the Emporia Telephone Company, the Paola Telephone Company and the Sabetha Telephone Company and president of the Farmers State Bank of Neosho Falls. Defendant is charged with embezzling, abstracting and willfully misapplying the funds of the Emporia bank. This bank and the Neosho Falls bank were closed by the bank commissioner August 8, 1933. Various transactions had by defendant with reference to the corporations named furnish the facts upon which the various counts in the information are based. At the outset it should be stated that the National Bank of Topeka was the correspondent bank at Topeka for the Emporia bank. The defendant makes a vigorous argument that the evidence of the state was not sufficient to prove the commission of a crime as to any of the counts. For that reason the evidence as to each count will be briefly noticed. It should be stated here that Robert Needels was assistant cashier of the Emporia bank and Fred A. Baird was the cashier.

The first count charges the embezzlement of $7,000 on or about December 27, 1932. On that date defendant had an overdraft in his personal account of $7,915.63. This overdraft had accumulated since November 21, 1932. On December 27 defendant directed the cashier of the bank to charge the account of the Fidelity bank with

the National Bank of Topeka with $7,000 and to give him credit for the $7,000. This was done. He stated he would go to Topeka the next day and would place $7,000 in the Topeka bank for the Emporia bank. He never did make this deposit. The argument of defendant is that what happened was merely the change of one form of indebtedness for another; that the bank lost nothing by the transaction on December 27. Hence, there was no embezzlement. We cannot take such a narrow view. We will consider the case as the trial court did from the viewpoint of the entire course of dealing of defendant extending over many months. There were other instances of overdrafts and the covering of them with questionable transactions. There were instances of the withdrawal of cash items from the bank and the replacing of them with worthless paper. These were matters of habit and practice with the defendant. A particular part of a transaction may be innocent and regular in itself, but when in conjunction with other acts the result is that money is taken out of the bank and converted to the use of another and the bank is defrauded, embezzlement has been committed. When this whole course of dealing is examined it becomes plain that the steady withdrawal from November 20 to December 27 so that the overdraft amounted to over $7,000 on that day, together with the attempt to meet the situation by the bogus deposit of $7,000 in the account of the Topeka bank, constitutes a conversion of the funds of the Emporia bank. Certainly there can be no doubt that a *prima facie* case of intent to defraud the bank was proven.

Count 2 charges the embezzlement of $9,056.26 on August 5, 1933. On Sunday, August 6, defendant met Needels and Baird at the bank. At that time he had an overdraft in his personal account of $8,361.49. In order to cover this overdraft defendant deposited some cash and a check for $3,256.16. This check was dated August 1, 1933. It was signed "The Kansas Home Telephone Company, Liq., by Nell Roach," and made payable to the Kansas Home Telephone Company and drawn upon the Farmers State Bank of Neosho Falls. At the time of the trial it bore the stamped indorsement of the Emporia Telephone Company. The name of Nell Roach was written by defendant. The Kansas Home Telephone Company had no account with the Neosho Falls bank during 1933; neither did the Kansas Home Telephone Company, Liq., have an account with that bank in 1933. The defendant had not been connected with the Kansas Home Telephone Company since 1929. The cashier of the

Neosho Falls bank testified that had this check reached that bank before it was closed August 8 it would not have been paid, but would have been sent to defendant at Emporia. Defendant attempted to explain this check to the jury, but there was abundant circumstantial evidence from which the court and jury were warranted in reaching the conclusion that the transaction was a bogus one intended to cover the overdraft of defendant for the time being.

In addition to the deposit of the check just referred to the defendant told Needels to charge the National Bank of Topeka with $5,800. Defendant stated he was going to Topeka on Monday or Tuesday and would place that amount in the Topeka bank for the Emporia bank. Needels entered this transaction on the records of the bank, showing the deposit to defendant's account in the Emporia bank in the amount of $5,800. No deposit was made in accordance with this conversation. The Emporia bank received nothing for the credit of $5,800 given defendant.

At the conclusion of the transactions just detailed, instead of an overdraft of $8,361.49, defendant's account showed a credit balance of a few dollars. The argument of defendant is that after the deposits that have just been detailed had been made the bank was no worse off than it had been before, and the transaction with reference to the $5,800 credit was only a promise to do something in the future and cannot be the basis of a criminal prosecution. To this argument the same answer must be made in considering count 1. We must look at the course of dealing of defendant. The making of the overdraft in so large an amount and then the attempt to cover it by bogus transactions, all considered, make a good case of converting the money of the bank to defendant's own use with intent to defraud the bank. Defendant complains as to this count that he was not permitted to testify that he intended to make the deposit of $5,800 at the time of the conversion. This offer of proof was refused because it tended to show restitution rather than intent. The conversion of the money took place while the overdraft was being built up. The securing of the credit for $5,800 was only part of the scheme. The criminal act was complete when the money was taken. What transpired after this could have no bearing on what the intent of defendant was in taking the money in the first place. There is a reason for this rule. People to whom money is intrusted cannot be heard to say they used the money but intended to put it back. If this should be the rule every embezzler would say that. See *State*

*v. Pratt,* 114 Kan. 660, 220 Pac. 505; also *State v. Wacker,* 120 Kan. 387, 243 Pac. 1026; also *State v. Robinson,* 125 Kan. 365, 263 Pac. 108. There is a further reason why this ruling of the trial court may not be urged as error here. While permission to answer the specific question whether he intended to make the deposit was denied, defendant was permitted to testify that at the time he deposited the telephone company check, heretofore spoken of, and at the time he received the credit for $5,800, he had no intention of defrauding the Emporia bank.

In count 14 defendant is charged with the embezzlement of $1,700 on July 22. On that day the account of defendant was overdrawn in the amount of $404.69. Defendant came to the bank with Mr. Needels. Defendant took out of the bank cash items in the amount of $1,005.25. Mr. Needels testified that to meet this situation defendant told him to debit the account of the Emporia bank with the National Bank of Topeka with $1,700. This was done and defendant was given a deposit credit of $694.75. No deposit was ever made to substantiate this entry. The Emporia bank received nothing for this credit. Defendant testified he did not tell Needels to charge the Topeka bank with the $1,700, but told him he would bring in a check to cover the item. He testified that on July 31 he brought to the bank a check to cover this $1,700 item and a $2,500 item, which is involved in the fifteenth count. Let it be said here, that, unexplained by defendant, the transaction just detailed clearly constituted embezzlement, both as to the overdraft that was balanced and the credit created and the cash items that were taken out.

Count 15 will be discussed now since part of the explanation offered by defendant as to that count has some bearing on count 14. In count 15 defendant is charged with embezzling $6,366.19 on or about July 29, 1933. On that day defendant and Mr. Needels were at the bank together. Defendant took certain cash items out of the bank in the amount of $3,498.80. He was overdrawn $3,999.91 on his personal account and he secured a credit of $4,000 to his personal account. This credit, plus the cash items referred to, amounted to $7,498.80. At the same time defendant left with the bank good checks in the amount of $1,032.61. The difference which defendant received that day is $6,366.19. For this the bank got nothing. The defendant left with the bank also his personal check for $2,000 drawn on the Neosho Falls bank and a check for $1,866.19 drawn on the Neosho Falls bank and signed "The Neosho Falls Telephone

Company" by Nell Roach, payable to the Emporia Telephone Company, and dated July 26, 1933, and bearing the indorsement of the Emporia Telephone Company. These checks were sent through channels for collection, but never paid. The bank actually received nothing for them. There is evidence in the record on both sides of the question whether these two checks were given in good faith, but in view of the fact that the jury apparently took the view they were not given in good faith, and there was ample evidence to sustain that view, that action will not be discussed further.

In addition to the two checks mentioned, Mr. Needels testified that defendant instructed him to charge the National Bank of Topeka with $2,500. Needels did this, and made the proper entries on the records of the bank. The bank received nothing for the $2,500. The transactions related as to this count happened on Saturday, July 29, after banking hours, or on Sunday, July 30. Defendant, in testifying as to count 14, denied he told Needels to charge the National Bank of Topeka with $1,700, but stated he told Needels he would give a check for that amount. He also denied he told Needels, with reference to count 15, to charge the $2,500 to the Topeka bank, but stated he was very much surprised to learn, a week after the transaction as to count 14, that this $1,700 had been charged to the Topeka bank. He testified that when he learned this he brought to the bank a check for $4,200 to cover the $1,700 item and the $2,500 item. He also was permitted to testify he later issued another draft for $4,200 on the Traders Gate City Bank for the same purpose; that he issued this draft because he thought the check for $4,200 on the Neosho Falls bank might embarrass it; and that he had sufficient money on deposit in the Gate City bank to pay the check. The complaint of defendant with reference to these two counts is that he was not permitted to make a further showing as to these two checks. The affidavit of defendant, furnished on the hearing of the motion for a new trial, covers what his testimony as to these checks would have been, and, with the exception of the fact he identifies the checks, it is substantially as he was permitted to give from the witness stand. Under the circumstances, we are not disposed to hold the ruling of the court in not permitting defendant to testify further was error. This holding might very well dispose of the argument of defendant as to counts 14 and 15. There is, however, additional reason why the evidence might have been properly refused. As proven, the counts

both consisted in part of the covering of an overdraft by a bogus transaction. We have seen heretofore in this opinion this constitutes embezzlement. Both counts also included the taking from the bank of certain cash items. Cash items have a definite meaning in bank parlance. The term applies to items for which the bank has paid its money, but for which it has not been paid, and which for some reason have not been placed on the books of the bank in their proper place, but are carried in the assets of the bank as cash. As far as the record in this case discloses the defendant and the bank were treating the cash items concerned as cash. So when defendant took the cash items out of the bank he was in the same position as if he had taken so much currency out.

As to count 14, the proffered testimony was that he furnished a check to cover this withdrawal a week after the event. He was permitted to testify that he had no intent to defraud the bank and that at the time he took the items out he intended to put in a check. Was it error to refuse to permit him to testify about putting in the check a week afterwards? The defendant insists that it simply has a bearing on the intent, and was a part of the transaction. The state insists that it is an attempt to prove restitution. There can be no doubt the crime of embezzlement was consummated when the cash items were taken from the bank as far as the conversion is concerned. Defendant argues, however, that embezzlement is not complete until intent to defraud is shown. The question is, then, How far will defendant be permitted to go in showing acts performed after the conversion in order to show lack of intent to defraud? This takes us into the reason for the rule.

Manifestly a banker cannot be heard to say he embezzled money from his bank and later returned it. If this should be the rule, money in a bank would never be safe. The reason for this lies in the frailty of human nature. The bank official who could use the money of the bank under such circumstances as to constitute embezzlement, and then restore, would be tempted to do so, and thus subject the money of the bank to the vicissitudes of whatever enterprise or speculation the banker might desire to indulge in. Keeping this thought in mind, let us examine what happened here. Defendant was the president of the bank, and the cashier and assistant cashier apparently permitted him to do as he pleased with the property of the bank. He carried out several thousand dollars in cash with no record at all. He had no right whatever to do this. Re-

gardless of what he says as to his intent, let us see how the reason for the rule applies here. During the week that transpired between July 22, 1933, and July 28 that year, events were moving forward that were to bring about a closing of the Emporia bank and the Neosho Falls bank and the financial ruin of defendant. At that time he was in possession of the cash of the bank with no record to show for it. Before he did get a compensatory check ready the cataclysm occurred, and the reason noted a moment ago came into being. Whether it be called an attempt to show restitution or to prove lack of intent such a course of conduct cannot be approved. The same reasoning applies with equal force to count 15.

In count 3 defendant is charged with the embezzlement of $6,000 on or about June 10, 1933. The account of the Emporia Telephone Company with the bank for June shows a charge of $6,000 against the telephone company June 10. The bank sent to the treasurer of the Emporia Telephone Company at Topeka a statement each month of the account of the telephone company with the bank for that month. This $6,000 first came to the attention of the bank officials about July 1, when Mr. Needels noticed a clerk changing this statement to be sent to the telephone company so as to omit this $6,000 item. This clerk testified that she had been instructed by defendant to omit this item. When Needels saw this he told defendant he would have to bring something to the bank to show for this $6,000. Defendant left the bank and returned shortly with a check in the amount of $6,000 payable to the Emporia bank and signed "W. W. Finney, Pt." This check was deposited to the account of the Emporia Telephone Company and charged to the Emporia Telephone Company so that the account was in the same condition after the transaction as before. This check was placed in the files of the bank. Each month when the account of the telephone company with the bank was forwarded to the office of the telephone company at Topeka the bank indorsed the checks drawn upon the account of the telephone company. The clerk made up the report for June, but omitted the $6,000 item, and did not forward the check. She testified she did this for the June and July business because the defendant instructed her to do so. There was additional evidence introduced on the count, but it is not deemed necessary to set it out here. Suffice it to say there was ample to make out a case of embezzlement against defendant. The defendant denied the statements of the clerk and Mr. Needels about

his having instructed her not to include the $6,000 charge in the report to. the telephone company. He further testified that the telephone company had some bonds coming due in the amount of $6,000, and that he had drawn drafts for the amount of the bonds which he had attached to the bonds and sent to the company at St. Louis, and that the telephone company not knowing this had sent cashiers' checks in the amount of $6,000 to pay for these bonds and that he had taken these checks and bought municipal bonds and held them for the telephone company. Defendant testified that when the clerk had trouble finding the check that had been paid for the bonds, he told her she should have it, but went ahead and drew the check that has been mentioned. So far, this count just presents a picture of two conflicting stories, one of which the jury believed. The argument of defendant as to this count is directed to a claim that he was not permitted to show certain transactions in his cross-examination of Mr. Needels. We have already seen that defendant testified he delivered $6,000 in bonds to the bank on August 8, 1933. Defendant complains he was not permitted to show by Mr. Needels that these bonds were received on August 8. An examination of the record discloses that Mr. Needels in answer to questions of counsel for defendant testified as to the receipt of the bonds and as to the proper entries. The court did exclude the exhibits offered, which were the bond record of the bank and· the deposit slip. We fail to see how this ruling could be prejudicial to defendant. Furthermore, the embezzlement was proven to have occurred on June 10, 1933. The offer was as to a transaction on August 8. What has been said here in discussing counts 14 and 15 is an answer to this argument. There is an additional reason why this particular evidence was not competent. It is claimed by defendant to be a part of the transaction relied upon by the state. The embezzlement took place June 10. The offer is of August 8. This bit of evidence might well have been refused because it was too remote.

In count 5 defendant is charged with the embezzlement of $4,000 on April 22, 1932. It will be remembered that defendant was president and general manager of the Paola Telephone Company. The financial offices of this company were located at Topeka, with the office of the Southwestern Bell Telephone Company. Mr. Needels testified that on April 22, 1933, defendant took $4,000 of cash items out of the bank and gave him a check for $4,000. The check bore no date; had no payee and the $4,000 was written in figures but not

in words. It bore the signature, "The Paola Telephone Company, Genl. W. W. F." This check was placed in a drawer along with other checks. It was the practice of the bank to render to the treasurer of the Paola Telephone Company at Topeka a statement of the month's business. The $4,000 item that has been spoken of was entered on the books of the bank as a charge against the account of the telephone company. When the report to the telephone company was made, however, for April, May, June and July, this charge was not included in the report. It was the practice also to send the canceled checks with this report. When these reports were made this particular check was not included. The bank clerk testified that all this was done at the direction of defendant. This had the effect of showing the Paola Telephone Company to have $4,000 more in the bank than the books of the bank showed it to have. There were additional incriminating circumstances introduced, but the detailing of them here would add nothing to this opinion. The evidence was enough to make a case of embezzlement with the intent to defraud the bank. Defendant denied that he had directed anyone to leave anything out of a report to the telephone company and also denied taking any cash items out of the bank on this occasion. His testimony further was there was a competing mutual telephone company at Paola; that there had been for some time a movement on the part of the citizens of Paola to cause the mutual company to sell, and there was to be a meeting at Paola to talk things over about April 20, and he purchased a draft for $4,000, with the check that has been spoken of, payable to himself, on the Gate City National Bank, so that he could use the $4,000 as earnest money in that transaction. He testified that the negotiations were not successful and he then deposited the draft to his personal credit in the Gate City bank and later returned the $4,000 to the telephone company's account. As thus detailed, the evidence presents a picture of two conflicting stories. The jury evidently believed the one related by the witnesses for the state. The ruling that the defendant urges as error as to this count is the alleged refusal of the trial court to permit him to relate the complete transaction as to the withdrawal of the money, the buying of the draft, the reason for buying the draft and the negotiations and finally the placing of the $4,000 back in the account of the telephone company. On account of the vigor with which this point is urged by counsel, the record has been checked with assiduous care to ascertain the

true situation. This has convinced us that defendant was permitted to show every fact contained in his affidavit used on the motion for a new trial and every fact was offered that had any bearing on the issues. There is some vagueness about a deposit to the account of the Paola Telephone Company in the bank on the day the bank closed, but no difficulty is expressed in ascertaining that a deposit of $4,000 was made.

There is a further reason why the ruling of the trial court in this matter was not error. The embezzlement was proven to have taken place on April 20. The $4,000 deposit was made on August 8, at a time when all concerned must have known the bank was doomed. For the reasons heretofore given in this opinion the trial court carefully scrutinized the proffered evidence because it concerned transactions that took place subsequent to the event which the state charges as a crime and was offered wholly to show intent, or the completion of a transaction. On this count it appears that there were hundreds of items with which defendant was concerned; at least one $4,000 item that appears about the same time as the transaction involved in this count took place. The record is not at all clear from testimony that was admitted or from what was offered but not admitted that the $4,000 deposit was any part of the transaction that took place in April. In case it should appear that it was all a part of that transaction it is about as clear a case of restitution as could be made out.

In count 8 the defendant was charged with embezzling $10,000 on or about July 1, 1933. Mr. Needels testified that in April or May defendant came to the bank and took out about $20,000 of cash items. In return for part of these items defendant left a memorandum stating that $10,000 in bonds had been left with the National Bank of Topeka by his son, Ronald Finney, for the Fidelity bank. Needels testified that defendant stated that Ronald had told him these bonds were in Topeka, but defendant did not know whether they were or not. This memorandum was changed several times. The one in the bank when it closed bore the date of July 1, 1933. It was carried as an asset of the bank from along in April or May until the bank closed. Needels testified that the bonds never had been entered on the bond account and upon the records of the bank and that if they had been the memorandum would have been taken out of the assets of the bank. So far this proves a clear case of embezzling $10,000 of the bank's funds. To

meet this, the defendant relied on the fact that the Emporia bank had bonds on deposit with the National Bank of Topeka to secure the deposits of Lyon county, and part of these bonds had been loaned to the Emporia bank by Ronald Finney. The error urged with reference to this count is the refusal of the trial court to permit defendant to show certain facts with reference to these deposits. We are unable to see where the proffered evidence was competent. The question was not whether the Emporia bank had bonds on deposit with the Topeka bank, but whether there were bonds there for meeting the memorandum. When the introduction of evidence was being discussed the trial court stated expressly that evidence going to prove that question would be admitted. The only attempt made by the defendant to take advantage of this holding of the court was to offer certain receipts covering deposits of bonds to secure county deposits. These documents had no bearing on the question under consideration.

Count 9 charges defendant with embezzling $5,379.40 on August 5, 1933. Mr. Needels testified that sometime in April or May when defendant took out of the bank the $20,000 spoken of in the discussion of count 8, besides the bond memorandum described in that count, he left a five-day draft executed by him on the Neosho Falls bank for about $5,500. This draft was withdrawn a few days later and a new one substituted and every few days between that time and August 5 a new draft was substituted. Sometime during that time $20,000 was paid on the draft so that on August 5 it was $5,379.40. At the time each of these drafts was drawn Needels testified that defendant instructed him to hold it and not send it for collection. Defendant testified that he issued the draft on the date it bore. He denied there had been different drafts and that he had ever told the bank people not to send it in for collection. He testified he had made arrangements for it to be paid at Neosho Falls (two conflicting stories), and the jury believed the witnesses for the state. The defendant argues that the trial court committed error by refusing to permit him to testify as to the arrangements made at Neosho Falls so that this draft would be paid. We have examined the record and find that the evidence about which complaint is made was admitted.

Count 10 charges defendant with embezzling $5,895.76 on or about August 5, 1933. Mr. Needels testified that at the same time when the $20,000 in cash items referred to in the discussion of

counts 8 and 9 was taken out of the bank by defendant, besides the bond memorandum and draft heretofore referred to, the defendant left a sight draft drawn by him on Harris Upham & Company, of Kansas City, Mo., in the amount of $5,895.76. The transactions referred to in counts 8, 9 and 10 all occurred on Sunday. Needels testified that at the time when this sight draft was left with the bank he was instructed to hold it and not send it in for collection. From time to time other drafts were substituted for this one, different only in date. At the time each draft was substituted Needels testified he was told not to send it in for collection.

Defendant admitted he drew the draft, but testified it was good when drawn, and denied that he ever told anybody at the bank not to send it in for collection. The state proved that about August 15 defendant called Harris Upham & Company and asked if a draft on him had come through, and when he was assured that none had, he instructed them not to pay it if one was presented. The defendant offered to show that he stopped payment on this draft to get money to pay $40,000 to depositors whom he paid after the bank closed. Defendant argues that the refusal of the trial court to admit this evidence was error. We think not. The question was the intent of defendant at the time he took out the cash items and gave the draft. What he offered to prove he intended to do with the money was an attempt to prove restitution.

Defendant argues that the facts proven under counts 8, 9 and 10 do not prove embezzlement. The theory of defendant is that what was taken out of the bank were cash items on which defendant was liable and that the memorandum and drafts were cash items. Thus, the net result was only the substitution of one form of indebtedness for another, which is not embezzlement. The trouble with that argument is that as far as this record shows the cash items taken out were all worth one hundred cents on the dollar, while the memorandum was found by the jury to be fictitious, and the jury found that defendant never did intend the drafts to be paid. As far as this record shows, the cash items taken out were the same as cash.

The defendant further argues as to these counts that they were all one single transaction and that his motions to compel the state to elect upon which count it would rely for conviction should have been sustained. The fact that the two transactions may have had some material fact in common is not decisive of whether they must be joined in one count or may be charged in more than one.

In *State v. Schmidt,* 92 Kan. 457, 140 Pac. 843, this court said:

"In criminal cases the ultimate test applied in determining the validity of a plea of former conviction or former acquittal is identity of offenses, and it is not necessarily decisive that the two offenses may have some material fact in common." (Syl. ¶ 2.)

It cannot be said there was only one conversion of the $20,000. It was effected by three separate instrumentalities. It is plain the facts that would convict as to counts 8 or 9 would not have convicted as to count 10. The motion to compel the state to elect was not good. See *State v. Ragan,* 123 Kan. 399, 256 Pac. 169, where this court said:

"If the facts which will convict upon the second prosecution would not necessarily have convicted on the first, then the first will not be a bar to the second, although the offense charged may have been committed under the same state of facts. (8 R. C. L. 143, 144.) A putting in jeopardy by one act is not a bar to a prosecution for a separate and distinct act, merely because they are so closely connected in point of time that it is impossible to separate the evidence relating to them on the trial for the one of them first had. Consequently a plea of former jeopardy will not be sustained where it appears that in one transaction two distinct crimes were committed. (8 R. C. L. 151.)" (p. 401.)

Count 11 charges defendant with embezzlement of $6,119 on or about August 7. On August 3, 1933, defendant mailed to the National Bank of Topeka several checks, amounting in the aggregate to $2,178.52. Included among these was a check for $611.92, dated August 1, 1933, payable to defendant, drawn upon the Emporia bank and signed "The Altoona Telephone Company by Nell Roach." Defendant received credit to his personal account for this amount on August 4. Shortly after that his account was closed and defendant withdrew his credit balance from the bank. When this check reached the Emporia bank it was paid. The Altoona bank had no account with the Emporia bank. It had been dissolved since 1930. Mr. Needels testified that defendant had authorized the bank to pay such checks.

Defendant claimed that when he sold the Altoona Telephone Company he received certain cash assets owned by the company, including accounts due, and that he had authority to use the name of the company in liquidating these accounts. He claimed that this check for $611.92 represented money that had been collected and paid to him, and he had sent this check for record purposes only. He testified that had the check been called to his attention he

would have paid it. Defendant complains that he was unduly restricted in his efforts to show the practice at the bank as to handling checks of this kind. The record has been checked carefully and it appears that all the evidence offered on this question was admitted. Defendant asks us to hold that the evidence on this count shows that there was nothing irregular about this check and no intent to defraud the bank was proven. To so hold it would be necessary for us to accept the explanation offered by defendant and his witnesses and disregard the evidence of witnesses for the state with all the inferences proper to be drawn therefrom. We cannot do that. It is hardly fitting to take up time in an opinion already too long to set out in detail the circumstances which might very well have caused the jury to accept the version of the matter offered by the state. Suffice it to say that we see no reason for disturbing the result.

Count 13 charges defendant with the embezzlement of $439.54 on or about October 7, 1932. A day or two after October 7, 1932, a draft drawn by the General Machine and Tool Company against W. W. Finney came to the Emporia bank for collection. It was forwarded to the Emporia bank by the Prairie State Bank of Augusta. Mr. Baird testified that when it first came to the bank and several times thereafter when it was called to his attention defendant said, "Let's not pay it now." He testified that on or about October 25 defendant told Baird to pay this draft and carry it. The bank paid the draft with its funds and carried it as a cash item. It was among the cash items when the bank was closed. The testimony of defendant was that he was receiver of an oil company and the draft was for the purchase price of supplies used by him as receiver. He stated when the draft came in he directed that it be not paid—that he would have to get a court order first. He denied that he ever told the bank people to pay it and that when he discovered it had been paid he instructed the bank employees to make some effort to recover the money. This statement was denied by the employees. The argument is that since the draft was to pay a bill of the receiver, defendant got nothing by its payment and hence could be guilty of no intent to defraud the bank. The fact remains that the bank paid out its money and received nothing for it but the draft which it carried as a cash item from October 7, 1932, until the bank was closed. It is not necessary to constitute embezzlement that the money converted should be used for the

benefit of defendant. It is sufficient if it was used for the benefit of a third party on account of acts performed by defendant.

In count 17 defendant is charged with embezzling $1,325.23 on or about August 8, 1933. This represents the amount of the overdraft of defendant when the bank closed. This had grown from a credit balance of nine cents on July 29. This is not a case where a depositor had an overdraft under ordinary circumstances. We have seen how defendant made a practice of overdrawing his account and then covering it with a fictitious transaction. We must consider the whole course of dealing with the bank on the part of defendant. It is possible that a transaction, apparently regular and lawful in every particular, may become criminal when at some stage it appears that the innocent instrumentality is being used to some criminal end. Thus, in *State v. Crow*, 124 Kan. 55, 257 Pac. 735, this court held that where the president of a bank had sold to it notes at par, which he had bought for a greatly reduced amount, the facts were sufficient to sustain a charge of embezzlement.

In this count there can be no doubt that the money of the bank was converted to the uses of defendant and that the bank received nothing for it. Under the circumstances we have concluded that a conversion with intent to defraud was shown.

Thus far the argument of defendant that evidence was not sufficient to prove embezzlement as to each count on which defendant was convicted has been dealt with. As each count was considered, the argument of defendant that the court refused to permit the introduction of competent evidence was also discussed. This was done so that the application of the proffered evidence to the particular count would readily appear. The disposition that has been made of the errors urged on account of rejected evidence disposes in a large measure of the argument of defendant that the trial court placed too strict a construction on the holding of this court in the case of *State v. Pratt,* supra, since most of the proffered evidence was offered to prove an act of defendant done after the commission of the acts which the state contended constituted embezzlement and which the defendant said were offered on the question of intent and to prove the completion of a transaction, and which the state contended would have had the sole result of proving restitution. The question is: What was the intent of the defendant at the time of the conversion? After the conversion has taken place there must be some time when the conversion of the money will carry with it

a presumption of intent to defraud, under the rule that every person is presumed to intend the natural and inevitable consequence of his own acts. In a case where the president of a bank has taken the funds of his bank out of the bank without any right, as soon as the banker has subjected the funds to the vicissitudes and uncertainties of business, the bank has been defrauded. When the conversion of the money has reached that point where there is no longer any question about the intent of the defendant, then further evidence as to conduct of defendant after the commission of the acts charged to constitute embezzlement is incompetent and immaterial.

The argument of defendant that the motion of defendant to require the state to elect upon which of counts 8, 9 and 10 it would rely for conviction has also been disposed of.

There remain several questions which defendant urges against the entire case.

Defendant argues that the information is bad for duplicity because it charges that defendant embezzled, abstracted and willfully misapplied the moneys, funds, securities or credits of the bank. He argues that embezzling is a crime, abstracting is a crime, and willfully misapplying is a crime, and they should not all have been charged in the same information. No motion to quash the information was filed nor was any motion to compel the state to elect filed. The matter is raised for the first time in this court. That is too late. An attack upon the sufficiency of an information must be made prior to the plea. In 31 C. J. 798 the rule is stated as follows:

"While it has been stated broadly that a motion to quash an indictment may be made at any time, or at any time before verdict, it is variously held that a motion to quash or set aside an indictment or information must be made before arraignment, or at arraignment, or before plea, or before trial, or submission of the case to the jury. . . . A motion comes too late after verdict, . . ."

In *State v. Pryor*, 53 Kan. 657, 37 Pac. 169, this court said:

"A motion to quash should precede arraignment. (*The State, v. Otey*, 7 Kan. 69; *The State v. Ruth*, 21 id. 583; 4 Am. & Eng. Encyc. of Law, 764.) The proper time to raise the question of sufficiency of an information or indictment before a verdict is by a motion to quash; after verdict, by motion in arrest of judgment. It is not good practice to raise an objection to an information by objecting to the introduction of testimony. . . . The general rule is, that duplicity in criminal cases cannot be made the subject of a motion in arrest of the judgment. It is cured generally by a verdict of guilty as to one of the offenses charged. (Whar. Cr. Pl., Sec. 255.) Therefore it is

important that the sufficiency of the information or indictment be disposed of before arraignment." (p. 658.)

See, also, *State v. Startzman*, 111 Kan. 136, 205 Pac. 1026.

In addition to the foregoing answer to this argument of defendant it may be said that this information followed substantially the wording of the statute and was good even against a motion to quash or to compel the state to elect.

In 31 C. J. 771 it is said:

"*Offenses Including Other Offenses.* An indictment is not double because it charges several related acts, all of which enter into and constitute a single offense, although such acts may in themselves constitute distinct offenses, and although one of the offenses is a felony and the other a misdemeanor. . . There are some instances in which two crimes are of the same nature and so connected that when both are committed they must constitute but one legal offense, in which case both may be charged in the same count."

In *State v. Hodges*, 45 Kan. 389, 26 Pac. 676, the question is settled. There this court said:

"As we understand, it is claimed that the present information is not good, for the reason that each count first charges the crime of actual embezzlement, and then charges a second offense by charging that the defendant made way with the same property and secreted it with the intent to embezzle and convert the same to his own use. This certainly does not render the information bad, for all these charges could have been shown under the single charge of actual embezzlement; for if a person commits the offense of actual embezzlement he must commit all the rest above specified. He cannot commit the offense of actual embezzlement without also attempting and intending to commit such offense; and he cannot commit the offense without also converting the property of his employer in his hands and which he embezzles to his own use, and without also attempting and intending to so convert it. All that was material in the aforesaid charge was included in the one charge of actual embezzlement. Besides, in the present case, before the defendant was called upon to introduce any evidence, the state elected to rely for a conviction upon the single charge of actual embezzlement and of the embezzlement of a particular thing; and this election was as to each count, and the defendant was convicted upon this election, and upon this election only. What we have said with reference to the first count may also be said with reference to all the other counts upon which the defendant was convicted." (p. 394.)

See, also, *State v. Meade*, 56 Kan. 690, 44 Pac. 619, and *State v. Richmond*, 96 Kan. 600, 152 Pac. 644.

The offense of abstracting or willfully misapplying are all included in the charge of embezzling. Only one transaction is relied upon in each count and only one crime is claimed to have been committed in each count. The rights of the defendant do not appear to have been prejudiced by the form of the information.

R. S. 62-1010 provides the indictment or information is sufficient if it appears therefrom—

"Fifth. That the offense charged is stated with such a degree of certainty that the court may pronounce judgment upon conviction, according to the right of the case."

R. S. 60-1011 provides—

"No indictment or information may be quashed or set aside for any of the following defects:

"Seventh. For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

R. S. 62-1718 provides—

"On an appeal, the court must give judgment without regard to technical errors, or defects, or to exceptions which do not affect the substantial rights of the parties."

These statutes are sufficient authority to sustain a holding that the argument of defendant against the sufficiency of the information is not good.

When the trial court submitted the form of verdict to the jury the jury was informed that it could find the defendant guilty of embezzlement or of abstraction or of willful misapplication. The defendant argues that the court by this action submitted a question of law to the jury and this was error. This argument is not good. At the same time that the court gave the jury the above information a verdict whereby the jury could find the defendant guilty of embezzling, abstracting and willfully misapplying was also submitted. The jury used the latter form of verdict. All the terms used were defined in the instructions by the trial court. The questions of law were all settled by the instructions. The jury had only to apply the instructions to the facts.

. In counts 1, 3 and 5 of the information defendant is charged with embezzling, abstracting and willfully misapplying the funds of the Fidelity State Bank rather than moneys, funds, securities and credits, as charged in the other counts. Defendant argues that he should have been discharged as to these three counts because the word "funds" of the bank means only government, state, county, and municipal securities or other forms of indebtedness, and the evidence on these counts did not prove the embezzlement of any of these. The argument is extremely technical. The word "funds" has a much broader meaning than is contended for by defendant. It has been held to have the following meaning, quoting from Black's Law Dictionary, 3d ed., 828:

"FUND, n. A sum of money set apart for a specific purpose, or available for the payment of debts or claims.

. . . . . . . . . . . . . .

"In the plural, this word has a variety of slightly different meanings, as follows:

"1. Money in hand; assets; cash; money available for the payment of a debt, legacy, etc. *Galena Ins. Co. v. Kupfer,* 28 Ill. 335, 81 Am. Dec. 284; *United States v. Jenks,* (D. C.) 264 F. 697, 698; *Wherrell v. U. S.,* 18 F. 2d 532, 533; *Federal Reserve Bank of St. Louis v. Quigley,* (Mo. App.) 284 S. W. 164, 166; *National Surety Co. v. Williams,* 74 Fla. 446, 77 So. 212, 221; *Bishop v. United States,* 16 F. 2d 406, 408; *Johnson v. State,* 37 Ga. App. 129, 139 S. E. 118, 119.

"2. The proceeds of sales of real and personal estate, or the proceeds of any other assets converted into money. (Citing case.)

"3. Corporate stocks or government securities; in this sense usually spoken of as the 'funds.'

"4. Assets, securities, bonds, or revenue of a state or government appropriated for the discharge of its debts." (Citing cases.)

### Quoting from 4 Words and Phrases, 3004:

"The word 'fund,' in its broader meaning, may include property of every kind. *In re Tatum,* 70 N. Y. Supp. 634, 635, 61 App. Div. 513 (Citing And. Law Dict.).

. . . . . . . . . . . . .

" 'Funds' include moneys and much more, such as notes, bills, checks, drafts, stocks and bonds. *United States v. Greve,* (U. S.) 65 Fed. 488, 490; *Hasbrook v. Palmer,* (U. S.) 11 Fed. Cas. 766; *Ayres v. Lawrence,* 59 N. Y. 192, 198."

"In indictment under Laws 1919, page 216, section 20, charging defendant, being an officer and employee of bank, with embezzling, abstracting, and misapplying moneys and funds of bank in named amount, the word 'funds' includes all bank's available assets, and hence instruction permitting conviction, if money, checks, note, funds or assets were embezzled, was not erroneous." (*Johnson v. State,* 166 Ga. 755, 139 S. E. 118, headnote.)

The word "funds" might have been used alone throughout the information with no loss to its force. The defendant has no cause to complain because of the use of this word alone in counts 1, 3 and 5. The word adequately describes the thing with which defendant was charged and convicted of embezzling in those counts.

Defendant requested the trial court to instruct the jury as follows:

"On this count I instruct you that if you find from the evidence that on the 27th day of December, 1932, the defendant had an overdraft in his account of $7,900 and that on said date a credit was given to his account and a charge made in the account of the National Bank of Topeka which had the effect only of reducing his overdraft on the books of the bank, and that

no funds of the bank were converted thereby, you must find the defendant not guilty on the first count in the information."

The instruction was refused. This is urged as error. The instruction was properly refused. The first part of the proposed instruction had no place in this case for the reasons given in our discussion of count 1. The remaining portion of the instruction was given elsewhere.

Defendant objected to instructions 1 to 42 for the reason that they did not each contain a paragraph instructing the jury that if it did not believe beyond a reasonable doubt that the state had proven each and every element necessary to complete the offense it was its duty to bring in a verdict of not guilty. Defendant argues that the failure of the court to add such a paragraph was error.

The court instructed the jury as to each count and at the conclusion of such instruction as to each count used the following instruction:

"If you and each of you find each and every element of the above and foregoing beyond a reasonable doubt, then and in such event it will be your duty to return a verdict of guilty against said defendant on the charge so contained and set out in the first count of the information filed herein.

"On the contrary, however, in event you or any one of you may not so find each and every element of such charge beyond a reasonable doubt, them and in such event you are instructed you cannot return a verdict of guilty against said defendant as to such charge so contained in such first count of such information."

The above instruction, repeated each time the court dealt with the instruction as to each count, is held to fairly cover the question of reasonable doubt.

Instruction 61, given by the court, was as follows:

"You are instructed that to constitute the offense of embezzlement there must be a conversion to the use of the defendant, or to the use of some other, of moneys, securities or credits of the bank, and if you find from the evidence as to any count or counts of the information that the defendant did not convert any of the moneys, funds, securities or credits of the bank to his own personal use or the use of some other with the intent to injure and defraud the bank, then in such case you are instructed that you must find the defendant not guilty as to such count or counts of the offense of embezzlement."

Defendant objected to this instruction on the ground that it placed on defendant the burden of proving his innocence. In view of the other instructions that were given on the question of reasonable doubt instruction 61 was not necessary, but it has the appearance of having been given for the benefit of the defendant. At any rate it did not have the effect contended for by defendant.

Instruction 60 was as follows:

"The intent to injure and defraud does not within the meaning of the statute necessarily involve malice or ill will toward the bank. The term as used in the statute means that general intent to injure or defraud which always arises in contemplation of law, when one willfully or intentionally does that which in its necessary and natural consequences must injure another so that while the offense of willful misapplication of the moneys, funds or credits of the bank must be committed by the accused with intent to injure or defraud the bank, that intent may be shown or be presumed from the doing of the wrongful, fraudulent and illegal acts which in their necessary results naturally produce loss or injury to the bank."

Defendant argues that the giving of this instruction was error because it tells the jury that it can disregard all other evidence as to intent except the doing of wrongful or illegal acts which in their necessary results produce loss or injury to the bank. The instructions must all be considered together, and when this is done it appears that the court fully instructed the jury on the question of intent.

In instruction 58 the trial court instructed the jury that—

"You are further instructed in regard to felonious intent that the law presumes a fraudulent or criminal intent when one willfully and knowingly appropriates moneys, funds, securities, or credits rightfully in his possession belonging to another, to any purpose inconsistent with the purpose of the original possession or for his personal or private benefit or use, whatever that benefit or use may be, without the knowledge or consent of such other person or owner, natural or artificial; and this is true, even though at the time he does it he intends to restore or replace it, or does actually restore it or its equivalent, he is nevertheless guilty of the offense of embezzling, or abstracting, or misapplying within the spirit as well as the letter of the law. His intent to appropriate the moneys, funds, securities or credits without authority so to do, is the intent which is an element of the offense, and the fact that he may or may not have had other intents, hopes, or aspirations is not material. Further, the motive which prompted the embezzlement, or abstracting, or misapplication, if such there was, is not material, nor is it any defense. Funds, moneys, securities or credits are applied to the use of an accused when he uses them in the way he desires to use them, whether for his personal use or for the use of another. If the defendant directed the disposition of the moneys, funds, securities, or credits for his own use or benefit, he thereby applied them to his own use, and the offense, if otherwise established, would be complete, and the fact, if it is a fact, that the bank as owner of the moneys, funds, securities, or credits set out and described in the several counts of the information, suffered no loss, or that these moneys, funds, securities or credits were ultimately returned to the bank, is of no materiality, and constitutes no defense on the part of the defendant, for the criminal character of the transactions is to be determined from the facts as and when they occurred, and if

they were then wrongful, they do not lose their criminal character by anything the defendant may do or fail to do thereafter."

Defendant argues that the giving of this instruction was error because it does not properly instruct the jury as to intent. The part to which defendant particularly objects is as follows:

"And the fact, if it is a fact, that the bank as owner of the moneys, funds, securities, or credits set out and described in the several counts of the information, suffered no loss, or that these moneys, funds, securities or credits were ultimately returned to the bank, is of no materiality, and constitutes no defense on the part of the defendant, for the criminal character of the transaction is to be determined from the facts as and when they occurred."

The argument is that the instruction eliminates the question of the good faith of the defendant and also eliminates the question of whether the bank lost anything as a result of the action of the defendant. In the first place, there is no count in this case, as has been demonstrated, where the bank did not lose on account of the acts of the defendant. In the second place, the defendant has a wrong idea of what constitutes embezzlement. He thinks that a bank president can take money out of the cash drawer of the bank, carry it around in his pocket, buy stock with it, or make any other use of it that he wishes to make, and so long as he intends to pay it back sometime he is not guilty of embezzling the funds of the bank on account of lack of intent. That is not the law. When a bank president, or any person named in R. S. 1931 Supp. 9-140, converts the funds of the bank to his own use with no right to do so and subjects it to the vicissitudes of life and business he has defrauded the bank. This has been demonstrated heretofore in this opinion.

The court told the jury orally just how it should mark the verdict form that was submitted to it. The defendant contends this was a violation of R. S. 62-1447, which requires the instructions of the court to be in writing. We have examined the oral statement of the court and have concluded what was said by the court was only an explanation to the jury as to how to mark their verdict and not an instruction as to the law of the case.

In *State v. Jones*, 137 Kan. 273, 20 P. 2d 514, this court considered this question, and said:

"In our view of the matter the claimed oral instruction was only a response to the foreman's question and was only a statement, using different language, of the written instruction. If any error was made, it was technical; there is no showing it affected the substantial rights of the defendant, and it must be disregarded." (p. 278.)

Defendant argues the verdict of the jury was void for the reason there were three distinct crimes charged in each count of the information and no evidence that defendant is guilty of more than one. The question is raised for the first time in this court. That is too late. If it had been raised in time the point is not good, as has been heretofore held in this opinion on the question of duplicity.

Defendant argues the trial court by its oral instruction and written instruction 47 told the jury in substance it could find defendant guilty if some believed he embezzled, some believed he abstracted and some believed he willfully misapplied. The defendant cannot complain of this since the jury found him guilty of embezzling, abstracting and willfully misapplying.

After the jury had returned a verdict of guilty on all twelve counts the court started to poll the jury. The first juror was asked the following question:

"THE COURT: Mr. Bixler, you have heard the verdict as just read with reference to the charge contained in the first count of the information filed in this case, let me inquire, is this your verdict and are you still satisfied therewith?"

To this the juror answered "No." The jury was sent back to continue its deliberations. When a verdict was again returned defendant again asked the court to poll the jury by asking the same questions. This the court refused to do. Defendant argues that this was error. The question was not a proper one to be used in polling a jury. The only reason for polling a jury is to ascertain if the verdict returned is really the verdict of all the jury. The question that will enable the court to ascertain that, is the question "Is this your verdict?" At that stage the court is not concerned with the question of whether each juror is satisfied with the verdict.

In *Bowen v. Bowen*, 74 Ind. 470, that court said after quoting from authorities:

"We are satisfied that the rule declared by these cases is a sound and practical one. The question 'Is this your verdict?' asks for all the information a party is entitled to receive, and affords each juror ample opportunity to dissent, if he is dissatisfied."

See, also, *Black et al. v. Thornton*, 31 Ga. 641; also *Oil ·Co. v. Moore*, 202 N. C. 708.

On the hearing of the motion for a new trial an affidavit of one of the jurors was introduced. In the affidavit the juror described the deliberations in the jury room. The juror stated that the jurors

were greatly impressed by instruction 58 that has been heretofore set out in this opinion and that the jurors placed the interpretation on the instruction that it was their duty to convict if defendant used the money regardless of the intent defendant may have had at the time. Defendant argues that this affidavit was the ground for a new trial. In the first place, a juror cannot impeach his verdict in this manner. (See *State v. O'Keefe,* 125 Kan. 142, 263 Pac. 1052; *State v. Wright,* 112 Kan. 1, 208 Pac. 630; and *State v. Keehn,* 85 Kan. 765, 118 Pac. 851.) In the second place, the interpretation claimed to have been put on the instruction is not far from the correct one.

The defendant points out that during the course of the trial the court room was crowded and that frequently there were bursts of laughter and applause, which showed that the crowd was in sympathy with the state and prejudiced against the defendant. It is pointed out that the trial court did not admonish the jury that it should not be influenced by the crowd. The jury was kept together during the trial. They were not permitted to separate. On the hearing of the motion for a new trial the trial court considered an affidavit of one of the counsel for defendant which stated the occasions on which the crowd laughed and applauded. The court found that nothing came under its observation that would prejudice the jury. We are not disposed to disturb that finding.

Defendant argues that he should be granted a new trial on account of misconduct on the part of counsel for the state. This record does not disclose conduct other than what might be expected from a vigorous prosecutor. We find no evidence of misconduct.

Complaint is made of the prejudice of the trial court which prevented defendant having a fair trial. We cannot agree with this contention. There was not a great deal of dispute in the evidence. The case depended to a large extent on records and documents about which there could be but little dispute. There was a sharp conflict as to the admissibility of the evidence. Those questions were decided correctly by the court. There was no abuse of discretion on the part of the trial court in denying the continuance asked for by defendant. It does not appear that the defendant could have done anything further in the preparation of his case than was done. It does not appear that there is any error in this record.

The judgment of the trial court is affirmed.