No. 27,723.

THE STATE OF KANSAS, *Appellee*, v. JACK O'KEEFE, *Appellant*.

(263 Pac. 1052.)

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*New Trial—Jurors' Affidavits Impeaching Verdict.* Rule followed that jurors cannot impeach their verdict by their affidavits or testimony as to what caused them to agree to the verdict.

2. CRIMINAL LAW—*Function of Jury.* In a prosecution for burglary and larceny the function of the jury is to determine the guilt or innocence of the defendant from the evidence received and the instructions given. The jury has nothing to do with the extent of the punishment. That is fixed by the court in accordance with the statute, or by the statute. The fact that one or more of the jurors did not understand that a sentence to the penitentiary would follow a verdict of guilty is no reason for granting a new trial.

3. CRIMINAL LAW—*New Trial—Statements of Juror Not Based on Evidence.* While the jury was deliberating, one of the jurors made a statement purporting to be on his personal knowledge, and which was not based on the evidence. *Held,* considering the nature of the statement and the facts concerning it, as stated in the opinion, not to require or to justify the granting of a new trial.

Appeal from Shawnee district court, division No. 3; OTIS E. HUNGATE, judge. Opinion filed February 11, 1928. Affirmed.

*W. E. Atchison, Rad M. Lee, A. E. Crane, B. F. Messick* and *A. H. Crane,* all of Topeka, for the appellant.

*William A. Smith,* attorney-general, *Paul H. Heinz,* county attorney, *Edward Rooney* and *Ralph W. Oman,* assistant county attorneys, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Jack O'Keefe was found guilty of burglary and larceny. He has appealed, and contends that the court erred in refusing to grant a new trial because of the misconduct of the jury. This is the sole question presented.

The facts disclosed by the record are substantially as follows: B. R. Whitmore owned and operated a garage facing west on Gage boulevard leading south from the western part of Topeka. His residence was across the alley east of the garage. Because his place had been previously broken into on several occasions, he put in an electric-alarm system so arranged that the opening at night of any

Criminal Law, 16 C. J. pp. 1172 n. 66, 1176 n. 18, 1236 n. 50, 1237 n. 62.

door or window of the garage would cause a gong to ring in his residence. About 4:30 o'clock on the morning of August 14, 1926, the gong rang. Armed with a 32 pistol and a 22 rifle he went from his residence to the garage and along the north side of it and saw that a window on the north side was open. He went on west to the pavement and while standing there watching the building he saw a light inside of the building as from a flashlight showing through the crack under the front door. A little later he saw something thrown out of the window on the north side. This proved to be a tire and some tubes. A little later a man got out of that window. Whitmore was then about 80 feet west of this window, and although it was just beginning to get daylight he could tell that the man getting out of the window was wearing white gloves. Whitmore started toward him. The man ran east on the north side of the garage to the end of the building and turned south. By that time Whitmore was much closer to him. South and east of the garage was a flower bed about 300 feet across, containing peonies, and perhaps other flowers and shrubs. The man started south across this bed about the time Whitmore got around the corner of the garage. Whitmore then began to shoot at him with his revolver, and fired several shots. The man either fell or stooped down. Soon the man went on south, Whitmore following some little distance behind to the south edge of the peony bed, where there was a street west to Gage boulevard. The man went west on this street to the boulevard and south, Whitmore following. About the time Whitmore got to the boulevard he began shooting at the man with the rifle. The man fell near the east side of the boulevard. Whitmore approached nearer him and asked the man if he could get up. He said he thought he could. Whitmore then told him to get up and to cross the boulevard to a residence, had him sit down on the porch and had the resident call the sheriff and an ambulance. The calling brought other neighbors. While the man was sitting on the porch Whitmore, with the rifle in his hands, walked up within a few feet of him. The man got up and engaged Whitmore in a scuffle, or fight, for the rifle. Near where the man fell at the side of the boulevard two cans of tire patching were picked up a few minutes later, which Whitmore identified as having been taken from his garage. The defendant O'Keefe was the man Whitmore took over to the neighbor's porch. At the time of the scuffle the defendant was wearing a pair of white cotton gloves. A deputy sheriff and an ambulance came soon; O'Keefe was taken

to the hospital and his wound treated. It was found that he had been shot in the fleshy portion of the hip or thigh, and an X-ray showed that the bullet had struck the bone and shattered. The pieces were not removed. O'Keefe remained at the hospital a few days and when able to leave he was then charged with the burglary of the garage and larceny therefrom. It seemed that the entrance to the garage had been gained through the window on the north side by breaking a hole in the glass of the window near the corner, reaching in and pulling out a nail which held the window from sliding, and then sliding the window open. The above is the substance of Whitmore's testimony.

The testimony of defendant, who lived more than a mile east and a little north of this garage, as to how he happened to be at that place at that time in the morning was, that a day or two before he had made an appointment with a man to meet him at Seventeenth and Buchanan streets about four o'clock that morning to go to look at an auto truck the man desired to buy; that he went to the place agreed upon and the man not being there he had started to walk to meet him, and was walking along Gage boulevard for that purpose when he was shot by Whitmore. This would have taken him directly in front of the garage in question. His testimony is that he never left the pavement of the boulevard and was not in the garage.

Defendant, as a witness for himself, testified that he had previously been arrested for violation of the intoxicating-liquor law; that the last time he had been arrested for an offense of that character he had a still on his place, and that he received a sentence of eight months in the county jail, and had served more than six months of it before he was paroled. A sister of defendant, who was a witness, admitted on cross-examination that she had been charged and convicted of violating the intoxicating-liquor law and had served a term at the women's farm at Lansing for that offense. A number of witnesses called by defendant to show his general good reputation for honesty and integrity, on cross-examination, testified that they had read in the newspapers or had heard it talked in the neighborhood of defendant's violation of the intoxicating-liquor law.

On the hearing of the motion for a new trial the affidavits of five jurors were filed concerning matters that transpired in the jury room. It is upon these affidavits that appellant relies on the point here raised. The affidavits attempted to state what caused some

of the jurors, and especially juror Graham, to agree to a verdict of guilty. On this point the affidavits were not proper to be considered by the court, and perhaps were not considered. It is well settled that a juror cannot be heard to impeach his verdict by saying that he agreed to it upon consideration of matters other than the evidence and the instructions of the court. (16 C. J. 1236; *State v. Taylor*, 90 Kan. 438, 133 Pac. 861; *State v. Dreiling*, 95 Kan. 241, 147 Pac. 1108; *State v. Johnson*, 99 Kan. 850, 163 Pac. 462.) See, also, *State v. Farrar*, 103 Kan. 774, 176 Pac. 987, where earlier cases are discussed. Later cases are *State v. Luft*, 104 Kan. 353, 179 Pac. 553, and *State v. Shoemaker*, 112 Kan. 805, 212 Pac. 890.

One or more of the affidavits indicated that one or more of the jurors would not have been willing to agree to a verdict if they had known that it carried with it a penitentiary sentence, and that they did not understand the instructions of the court in that regard. The court did not tell the jury in his instructions what the punishment would be in the event the defendant was found guilty. This was proper, for fixing the extent of the punishment is not a function of the jury. The function of the jury is to determine whether the defendant was guilty of the offense charged. The punishment is fixed by the court in accordance with the statute. (R. S. 21-523, 21-524.) For many offenses the court really has nothing to do with the extent of the punishment, the sentence being an indeterminate one under the statute. (R. S. 62-1521.) Hence, that was no reason for granting a new trial. (*State v. Keehn*, 85 Kan. 765, 118 Pac. 851.)

Another element of the claim of misconduct was this: The juror Brown made affidavit that:

"Shortly after the jury went out I heard some of the jurors discussing the fact that Jack O'Keefe's sister was in the penitentiary for bootlegging, and that Jack had been up for bootlegging; that juror Flemming said he had known Jack and the O'Keefe family over in Jefferson county and that all of them were bootleggers, and none of them were any good; that I then told Flemming that we were instructed to try Jack O'Keefe on the evidence in this case and not on anything else."

One other juror made a similar affidavit. It will be remembered that defendant's sister when a witness admitted that she had been convicted of violating the intoxicating-liquor law and served time at the women's farm at Lansing, which, as is generally known, is

conducted in connection with the state penitentiary there; and defendant had testified that he had been convicted for violating the intoxicating-liquor law, and a number of other witnesses called on his behalf had testified to the same thing; hence, so far as the jurors discussed those matters, they were discussing the evidence. The statement of the juror Flemming that he had known Jack and the O'Keefe family in Jefferson county and that all of them were bootleggers and none of them any good, were not matters brought out by the evidence; in fact, the evidence did not disclose that defendant had ever lived in Jefferson county. His testimony was that he was born in Pottawatomie county, and that when he was eight years of age his parents moved to a farm a few miles southwest of Topeka, where he has since lived. But it will be noted by Brown's affidavit that as soon as Flemming made that remark he immediately told Flemming that they were instructed to try Jack O'Keefe on the evidence in this case and not on anything else. This seems to have ended that part of the misconduct. There is no reason, in the face of this admonition, to assume that the jurors paid any attention to Flemming's statement relating to the O'Keefe family in Jefferson county, or that it was given any attention other than that he was rebuked by the juror Brown for having made such a statement. That does not disclose a reason for setting aside the verdict or granting a new trial. (See cases previously cited.)

The abstract furnished by appellant in this case gave a very general statement only of the evidence, but set out the affidavits used on the motion for a new trial. No counter abstract was furnished by appellee. We might have affirmed the case by assuming there was evidence relating to some of the matters discussed by the jury as shown by the affidavits and concerning which appellant complains. But deeming it possible that such an assumption would be unjust to appellant, we have sent for and examined the original record and transcript in the case, from which the statement of facts in the opinion was taken.

There is no error in the record. The judgment of the court below is affirmed.