No. 33,884

The State of Kansas, *Appellee*, v. Charles E. Dye, *Appellant*.

(83 P. 2d 113)

Opinion filed October 8, 1938.

*Arthur H. Snyder,* of Hutchinson, for the appellant.

*Clarence V. Beck,* attorney general, *Wesley E. Brown, J. Richards Hunter* and *Gerald C. Stover,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

Hutchison, J.: This was a case of larceny, where the defendant was charged with having unlawfully, feloniously and willfully stolen, taken and carried away and converted to his own use on November 1, 1935, in Reno county, Kansas, three thousand dollars, lawful money of the United States, belonging to Mrs. Jennie Wynn.

The complaint was sworn to by Mrs. Jennie Wynn on April 29, 1936. The defendant waived preliminary hearing and was bound over to the district court of Reno county, Kansas, and gave bond for his appearance in district court. Upon trial had in the district court of Reno county the defendant was found guilty by a jury.

which rendered such verdict on January 18, 1938, and a motion of defendant for a new trial was denied on February 5, 1938.

The appeal taken to this court involves the following questions, as stated by the appellant:

"1. Whether or not the state must prove venue.

"2. Must complaint be drawn and crime charged before complainant subscribes signature and swears to same?

"3. Was competent testimony excluded and incompetent testimony admitted?

"4. Were the state's attorneys guilty of misconduct?

"5. Is the verdict contrary to the law and the evidence?

"6. Whether or not the court can refuse to hear counsel for defendant on motion for new trial.

"7. Must the court hear the testimony of the jurors present at the hearing on motion for new trial of their misconduct during the deliberation on the verdict?

"8. Can the jurors permit themselves, in arriving at a verdict of guilty, consider the fact that the defendant did not testify and be influenced by that fact?

"9. Did the court err in overruling motion for new trial?"

The evidence of the state was by Mrs. Wynn, the prosecuting witness, and one other witness, Mr. Gray, the cashier of a bank at Hutchinson, Kan. The evidence of the defendant was by the same Charles Gray, C. O. Myers and Wm. T. Birzer. Several exhibits were introduced and offered by each side.

The evidence of Mrs. Wynn was briefly to the effect that she was seventy-four years of age, had been a widow for seven years and lived in Larned, Kan., since 1902; that she first met the defendant in March, 1935, that he came to her house and introduced himself as wanting to buy her house, that she told him she would take $3,000 cash for it, that he came about twice a week after that for some time and told her he had no cash but would trade her other property for it, but she told him she was not interested in any real estate and would take nothing but cash for it. He then offered to sell her oil leases, which she refused. That in October, 1935, she had some correspondence with a banker in Nebraska about getting some money from that bank in thousand-dollar bills, and at one of the several calls made at her home this correspondence was on her table, and as she returned from the kitchen defendant had one of these letters in his hand, the other lying on the table; that she went to Nebraska and returned therefrom on October 26. Defendant called again on October 28 and wanted to borrow some money. He called three

times that week. On the last of these visits he picked up a paper off her table with some writing on it and said it was good security for the loan that he wanted, but she told him she would not loan him any money. He left some papers on the table; she did not pick them up until after she lost the money; they were introduced as exhibits (one a note for $3,000, signed by defendant, and the other an assignment of an oil lease, the latter bearing the date of November 7, 1935); that when he left she started down town on business the first day of November; that he met her down town and insisted on her getting into his car. She refused several times and later consented, and he drove her to Hutchinson over her protests; that they went to the Leon Coffee Shop for lunch, that she went into the ladies' rest room and looked in her handbag and saw therein the three thousand-dollar bills and other money; that they sat at a table for two only and she placed the handbag on the table where it leaned against the wall; that later the defendant called her attention to something unusual on the street at her back and she turned her body around so as to see it, but saw nothing strange and turned back; that after lunch they drove around town and the defendant parked the car and excused himself. While he was gone about thirty minutes she opened her handbag and discovered her three thousand-dollar bills were gone. When he returned she asked him if he had taken the money out of her purse and he stated that he had, that he needed it and would pay her eight percent interest. She told him she wanted her money back right away. He started to drive back to Larned, and she asked him to let her out at Kirk's headquarters in Hutchinson, where she knew the people, but he would not do it and they quarreled all the way back to Larned. She reported the matter to Mr. Allison, at Hutchinson, on November 4. On the 5th of November, after he had taken the money, he came to her place and left his note for $3,000, dated November —, 1935. At that time she told him about having reported him to the officers for arrest, and he coaxed her not to arrest him. On October 28 he left on her table exhibits 1 and 2, that she was compelled against her will to sign a receipt for these, that she on the 9th of November recorded the assignment left with her in the office of the register of deeds of Barton county. She also in cross-examination denied having told the register of deeds of Barton county and C. O. Miller that she had loaned the defendant $3,000, and admitted that $250 had been returned to her and she understood her attorneys had collected

something additional. She identified many letters written her by defendant during November and succeeding months. There are some inconsistencies and confusion in her testimony as to dates, but the order and succession of occurrences are chronological.

The other witness called by the state was Mr. Gray, the cashier of the bank at Hutchinson, who said the defendant called at the bank on November 1 or 2 and cashed a thousand-dollar bill, the number of which corresponded with one of those owned by Mrs. Wynn, who had furnished the numbers of all three.

The testimony introduced by the defendant was that of the same Mr. Gray who testified as to the good standing of the defendant. Mr. Myers, register of deeds of Barton county, testified as to the recording of the assignment on November 9, 1935, and also as to Mrs. Wynn having told him she had loaned the defendant $3,000. Witness Miller testified as to a similar conversation with Mrs. Wynn. Mr. Birzer testified as to having leased the land for oil and gas to defendant on October 30, and having received the pay therefor on November 2 or 3.

On the hearing of the motion for a new trial the record shows the attention of the court was directed to two matters, although the errors assigned were many more. The first error mentioned in the hearing was the exclusion of exhibit 3, which the evidence shows Mrs. Wynn said she signed against her will and before it was filled out. It is as follows:

"EXHIBIT 3

"LARNED, KAN., Nov. 8th, 1935.

"I have this day received from C. E. Dye an assignment on an Oil & Gas lease on the N ½ of the SW 16, T. 19, R. 12 Barton Co., Kansas, and agree to assign same back to C. E. Dye upon the payment of $3,000 with interest to date. The $3,000 borrowed of Mrs. Jennie Wynn was three $1,000 bills which were my own property, and I hereby transfer same to C. E. Dye and will sign up for said bills if necessary.
"(Signed) MRS. JENNIE WYNN."

The other matter attempted to be shown by the defendant was the misconduct of the jury in arriving at the verdict rendered by considering during their deliberations the failure of the defendant to testify in his own behalf. The twelve jurors that tried the case were called by the defendant and sworn as witnesses, and one of them was asked by defendant's counsel many questions concerning that matter entering into their deliberations. The court sustained objections to each and all such questions and defendant's counsel then offered and placed in the record the answers the witness would

have given if permitted to answer those questions. The same tender of questions and proffered answers with the same objections and rulings were indicated of record as to the other jurors sworn as witnesses. At the conclusion of such questions, objections, rulings and offered answers counsel for defendant insisted that the court had the duty to make an investigation as to whether or not there had been any violation of the rule or misconduct of the jury, and without the testimony of the jurors there was no way for the trial court to make a finding of fact on that question. To this argument the trial court replied, "I am not making a finding of fact; I am just not permitting the jurors to impeach their own verdict."

The appellant contends that the several questions asked the jurors, as to their taking into consideration in reaching their verdict the fact that the defendant did not testify in his own behalf, bespoke misconduct on their part, while the state contends that the questions called for answers that would necessarily impeach the verdict. Every question asked on this subject showed the purpose of appellant to produce affirmative proof along the line of considering an improper presumption as strongly as any affirmative answer could have done. No well-trained and careful attorney would ask one of his own witnesses such a question without previous consultation and a right to expect nothing but an affirmative answer. So we have the real question before us, as the trial court had when it sustained the objections to the several questions along this line, viz., whether the attempted information and proof was to show misconduct of the jury or to impeach its own verdict.

Appellant cites the following authorities as to the use of oral testimony instead of affidavits in making this kind of proof on motions for new trial for the misconduct of the jury:

"Whether in this case the prohibition was disregarded, whether the jury or any one of them did consider the defendant's failure to take the stand in his own behalf—did permit that circumstance to weigh against him, was a question of fact to be determined by the trial court upon oral evidence which was not wholly harmonious and from which different inferences might reasonably have been drawn." (State v. Brooks, 74 Kan. 175, 179, 85 Pac. 1013.)

"These jurors were not subpoenaed to appear in court on the hearing of the motion for a new trial and give specific information regarding the names of jurors whose vote was influenced by the fact that reference was made to the failure of defendant to testify. It must be remembered that it is the allowing of oneself to be influenced by the failure of defendant to testify, the taking into consideration of the failure, that is forbidden by the statute. On account of the failure of defendant to have the juror in court for examination the

court saw fit to deny the motion for a new trial. This amounts to a finding that what the juror stated in the affidavit was not true." (*State v. Taylor,* 140 Kan. 663, 670, 38 P. 2d 680.)

So the method pursued to establish misconduct was in line with our previous decisions.

On the theory that the consideration by the jury of the failure of the defendant to testify in his own behalf was only misconduct, the appellant cites the cases of *State v. Rambo,* 69 Kan. 777, 77 Pac. 563; *State v. Brooks,* supra; *State v. Dreiling,* 95 Kan. 241, 147 Pac. 1108; and *State v. Taylor* supra, in all of which cases except the first, the Rambo case, the trial court either heard the oral evidence or read the affidavits of the jurors and held that the statements made by the jurors were not true. In the Dreiling case the holding in the Rambo case was neither approved nor extended.

This court has most decidedly taken and maintained the position that no juror should be allowed to impeach his own verdict, and that any testimony of a juror tending to show the consideration by the jury of the fact that a defendant failed to testify in his own behalf is not misconduct of the jury but is an impeachment of the verdict of the jury and should not be received in evidence. Some of the several strong decisions along this line are the following:

"The rule that jurors will not be permitted to impeach their verdicts has been announced in other cases. In *State v. Buseman,* 124 Kan. 496, 260 Pac. 641, the juror made an affidavit that a statement not introduced in evidence affected the verdict. The court denied the motion for a new trial and this court approved the action, and said:

" 'It is a general rule, founded on sound public policy, that jurors are not permitted to impeach a verdict to which they have deliberately agreed under the sanction of an oath. There would be little virtue or finality in verdicts if they could be impeached and overthrown by the evidence of dissatisfied or unduly influenced jurors. It has been said that: "It would result in perjury and bribery and there would be no end of litigation in cases tried before juries." ' (p. 499.)" (*State v. Taylor,* supra, p. 471.)

"After the verdict has been rendered and regularly received in court a juror will not be permitted to say that he did not intend to find a defendant guilty of the number of criminal charges named in the verdict." (*State v. Kearney,* 130 Kan. 474, syl. ¶ 2, 287 Pac. 261.)

"His explanation, if it is to be believed, is not creditable to him. To have united in a verdict for such a reason would have been a violation of his oath as a juror and a violation of law. Whatever were the real facts in the case and whatever his motive may have been, the verdict cannot be impeached by a juror upon evidence as to the considerations which actuated him in agreeing to a verdict of guilty." (*State v. Casebier,* 130 Kan. 762, 764, 288 Pac. 736.)

"The general rule is that a juror cannot be heard to impeach his verdict by

saying he agreed to it upon consideration of matters not in evidence." (*State v. Boller,* 147 Kan. 651, syl. ¶ 3, 77 P. 2d 950. See, also, *State v. O'Keefe,* 125 Kan. 142, 263 Pac. 1052.)

The trial court, in line with these holdings, sustained the objections to questions asked jurors which, if answered, would tend to impeach the jurors' verdict.

The appellant cites cases holding that all verdicts to be effective must have the approval of the trial court, and to approve it he must hear all the evidence introduced both on the trial and on the hearing of the motion for a new trial, but it must be competent evidence that is sought to be introduced or otherwise the court would not hear or consider it. Appellant insists that his counsel was not permitted to present his argument that the verdict was contrary to the law and the evidence. Our attention is not directed to any part of the record where any such a request was refused.

On the hearing of the motion for a new trial attention was called to an error of the trial court in excluding exhibit 3 from admission as evidence. A reference to a copy of it in the earlier part of this opinion will show that it is in the form of a receipt by Mrs. Wynn, dated November 8, 1935, for the assignment of an oil and gas lease and a transfer of the three $1,000 bills to the defendant. In the opinion, the statement of Mrs. Wynn concerning it was that she signed it under duress by the defendant and before it was filled out. If it had been admitted it would have to be considered along with a lot of other evidence, brought out mostly in cross-examination of Mrs. Wynn, to show that the transfer of these three $1,000 bills was a loan to the defendant secured by the assignment of the oil and gas lease. The question is, Does any such business-like arrangement, made either before or subsequent to the unlawful taking of the money, exonerate or excuse the defendant for the wrongful act with which he was charged, if he is found to have committed such wrongful act? Even if there was a genuine attempt of Mrs. Wynn to recover on account of her loss, that would not affect the question of guilt of a public crime. The two are separate, and any concession or compromise on her part will not excuse the defendant of a crime if he did commit the one charged.

It is said in 16 C. J. 97:

"The public and the person injured by a crime each has a distinct, although concurrent, remedy, as a criminal act is both a private and a public wrong, and these remedies may operate simultaneously. Recovery in a civil action does not bar a criminal prosecution. And therefore as a general rule the pendency of a civil action cannot be pleaded either in abatement or in bar."

And on page 92 of the same volume it is said:

"It is beyond the power of a private person to license the commission of a crime. As to the more serious crimes which are purely transgressions of the public right, it must follow that consent thereto of private persons directly injured thereby cannot, to any extent, purge such crimes of their character as public wrongs, nor render those who commit them less liable to punishment."

The same principles are expressed in 1 Bishop on Criminal Law, 9th ed., page 671, and 1 Wharton's Criminal Law, 12th ed., page 517. Two cases in Kansas hold the same way, one the case of *State v. Newcomer,* 59 Kan. 668, 54 Pac. 685, which was a rape case where the girl under eighteen years of age forgave the accused and subsequently married him, and the other, an arson case where the mother of the accused and owner of one-half interest in the building burned, later forgave and ratified the offense, being *State v. Craig,* 124 Kan. 340, 259 Pac. 802.

There was therefore no error in excluding exhibit 3 because neither it nor the rest of the testimony attempting to show a settlement would be a defense to the charge of the crime, if the one charged was committed by the defendant.

It is further argued that the value of the oil and gas lease assigned should not have been excluded, but that would not help to determine the one question submitted to the jury as to the willfully and unlawfully taking of the property described in the information.

Appellant argues that if any offense at all was committed by the defendant, it came more nearly being obtaining money by fraud, which is a separate statutory offense, and insists that there was not sufficient evidence to convict the defendant of the crime charged. The jury found under proper instructions that the evidence was sufficient and the trial court approved the verdict, and we find no error in such finding and approval.

Appellant urges another reason for the evidence being insufficient, namely, that the evidence did not show that the crime was committed in Reno county. It did show it occurred in the city of Hutchinson. It was said in *State v. Atteberry,* 117 Kan. 650, 232 Pac. 1020, that—

"On a question of venue, judicial notice will be taken, without evidence, of the fact that the city of Paola and all the public highways leading thereto for some appreciable distance are in Miami county." (Syl. ¶ 2.)

Several other cases to the same effect might be cited.

Appellant calls attention to the insufficiency of the complaint as described by Mrs. Wynn. This defect, however serious it may have

been, was waived by the defendant when he, without objection thereto, gave bond for his appearance at court. (*State v. Miller*, 87 Kan. 454, 124 Pac. 361.)

Other omissions, errors and alleged misconduct are argued and presented as grounds for reversal. They have all been considered and are held not to constitute any ground for reversal.

It might be further stated upon the main question here involved that the objections to the several questions asked the jurors by the appellant were properly sustained because it would make no difference in the results what the answers might have been, if in the affirmative they would have tended to impeach the verdict which must not and cannot be done by any juror, and if in the negative they would tend only to ratify or confirm the verdict, which required and needed no such support.

The judgment is affirmed.