No. 18,803.

In the matter of the Estate of Plich, Deceased, The United States of America v. The American National Bank of Denver and the State of Colorado.

(348 P. [2d] 706)

Decided January 18, 1960.   Rehearing denied February 8, 1960.

Mr. GEORGE COCHRAN DOUB, Assistant United States Attorney General, Mr. DONALD E. KELLEY, United States Attorney, Mr. ALEN S. ROSENTHAL, Mr. WILLIAM A. MONTGOMERY, Department of Justice, for plaintiff in error United States.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FLOYD B. ENGEMAN, Assistant, for defendant in error State of Colorado.

*En Banc.*

MR. CHIEF JUSTICE SUTTON delivered the opinion of the Court.

JOHN PLICH, a resident of Colorado, and a veteran of the Armed Forces of the United States, became a mental incompetent and afterwards died intestate on January 13, 1958. He was not survived by spouse or next of kin. Proceedings for the administration of his estate were commenced in the county court of Pueblo County, and letters of administration were issued to defendant in error, the American National Bank of Denver, Colorado, (which had been Plich's conservator during the final years of his incompetency).

At the time of his death Plich's estate consisted of two five and a half percent bonds in the face amount of $1,000.00 each, dated March 1, 1929, of the City of Aurora, Aurora Sewer District No. 1; United States Treasury Bonds of the face value of $600.00; and United States Series E Bonds with a conversion value of approximately $1,725.00.

This controversy arose upon the filing by the United States of its Escheat Claim for these bonds, founded upon Subsection 3502 (d) of "Title 38.—Pensions, Bonus, and Veterans' Relief" of the Act of 1957, 71 Stat. 137, 38 U.S.C. (Supp. V) 3502 (d). This Subsection reads as follows:

"(d) Withheld payments; temporary payment; disposition of withheld funds; escheat.

"All or any part of any benefits the payment of which is suspended or withheld under this section may, in the discretion of the Administrator, be paid temporarily to the person having custody and control of the incompetent or minor beneficiary, to be used solely for the benefit of such beneficiary, or, in the case of an incompetent veteran, may be apportioned to the dependent or dependents, if any, of such veteran. Any part not so

paid and any funds of a mentally incompetent or insane veteran not paid to the chief officer of the institution in which such veteran is an inmate nor apportioned to his dependent or dependents may be ordered held in the Treasury to the credit of such beneficiary. All funds so held shall be disbursed under the order and in the discretion of the Administrator for the benefit of such beneficiary or his dependents. Any balance remaining in such fund to the credit of any beneficiary may be paid to him if he recovers and is found competent, or, if a minor, attains majority, or otherwise to his guardian, curator, or conservator, or, in the event of his death, to his personal representative, except as otherwise provided by law; however, payment will not be made to his personal representative if, under the law of his last legal residence, his estate would escheat to the State. Any funds in the hands of a guardian, curator, conservator, or person legally vested with the care of the beneficiary or his estate, derived from benefits payable under laws administered by the Veterans' Administration, which under the law of the State wherein the beneficiary had his last legal residence would escheat to the State, shall escheat to the United States and shall be returned by such guardian, curator, conservator, or person legally vested with the care of the beneficiary or his estate, or by the personal representative of the deceased beneficiary, less legal expenses of any administration necessary to determine that an escheat is in order, to the Veterans' Administration, and shall be deposited to the credit of the applicable current appropriation."

The claim alleged that Plich died leaving funds derived from benefits paid by the Veterans Administration; that these funds were, at the time of the veteran's death, in the hands of the duly appointed conservator of his person and estate; and that the United States was entitled to the reversion of such funds.

The State of Colorado thereupon intervened, alleging that some of the assets owned by the deceased were not

"the type or kind of assets to which Section 3502 (d), Title 38, United States Code is applicable," and sought to have those assets paid over to the State Treasurer in accordance with C.R.S. '53, 152-14-14 (2).

The trial court found that all of the assets in the estate were derived from benefit payments made under acts of Congress administered by the Veterans Administration. It held, however, that the United States was not entitled to any of the bonds for the reason that they were not "funds" within the meaning of 38 U.S.C. (Supp. V) 3502 (d). It ordered the conservator to turn over the bonds to the State Treasurer, and to pay any cash in the estate to the Veterans Administration.

The holding of the trial court that the United States was not entitled to the bonds in the decedent's estate necessarily rests upon the premise that the term "funds," as used in the federal statute, encompasses nothing more than currency. It is the position of the United States that this restrictive construction is erroneous and that the term includes, at the very least, securities which are either negotiable in character or redeemable at any time at the option of the holder. The bonds here involved all fall into such categories.

In common parlance, the word "funds" is understood to encompass more than currency. The scope of the term extends as well to "negotiable paper readily convertible into cash" and "available pecuniary resources." Webster's New International Dictionary (Unabridged), p. 1019 (Second Ed., 1958). In fact, "The word 'fund' in its broader meaning may include property of every kind." 17 A Words and Phrases, 552, citing *In re Tatum* (1901), 70 N.Y.S. 634, 635, 611 App. Div. 513.

On numerous occasions, and in a variety of contexts, the courts have been called upon to define the term "funds." An examination of the decisions in this area discloses a general judicial recognition that, in accordance with common usage, the term is to be given a much

broader scope than that ascribed to it by the trial court. For example, " 'Funds' includes moneys, and much more, such as notes, bills, checks, drafts, stocks, and bonds." *United States v. Greve* (1894), 65 Fed. 488, 490 (E.D. Mo.). See also, to the same effect, *Hasbrook v. Palmer* (1839), 11 Fed. Cas. 766 (Fed. Cas. No. 6,188) ("Funds" held to mean more than money when used in promissory note.); *Ramsey v. Cox* (1873), 28 Ark. 366, 368 (State treasury certificate held to be "funds."); *State v. Finney* (1935), 141 Kan. 12, 30-31, 40 P. (2d) 411, 421. In other words the general term can and does include not only currency but also other types of pecuniary resources which are readily converted into cash.

Indeed there is one case in which "funds" as used in the predecessor of Section 3502 (d) (and before it was re-enacted with some changes not material here) was expressly determined to include bonds. See *Coakley v. Attorney General* (1945), 318 Mass. 508, 62 N.E. (2d) 659. In that case, the guardian of a deceased incompetent veteran held adjusted service Government bonds, which were a product of federal adjusted service compensation, and moneys derived from a federal pension. There the Supreme Judicial Court of Massachusetts stated: "We have no doubt that the net assets held by petitioner are 'funds' within the Federal Act [38 U.S.C. 450 (3)]." It then held that the whole estate reverted to the United States.

In *Coakley* the court further pointed out that veterans' pensions are the bounties of the government "which Congress has the right to give, withhold, distribute, or recall, at its discretion." (Citing authority.) "The United States as the donor may provide that so long as pension money can be traced and identified it shall be subject to such incidents and restrictions as Congress may prescribe." * * * And that "The will of Congress rises superior to the common law classification and qualities of estates. Congress may provide new and strange rules for the devolution of pension money. (Citing authority.)

The decisive thing is that the donor, the United States, has reserved the right to lay its hand upon the pension money or its proceeds in the event that has happened. The Act of Congress governs, and the United States is entitled to the property in question."

As this court observed in *Richardson v. El Paso Consolidated Gold Mining Co.* (1911), 51 Colo. 440, 447, 448, 118 P. 982, 985:

"The cardinal rule of statutory construction is to discover and enforce its intent. In construing a statute the cause and necessity for it, the object in view, and the evil which it is intended to remedy should always be taken into consideration in determining its intention; consequently, words employed should be given that meaning, when possible, which will result in effecting the object for which it was enacted."

■ As we view it, The Congress intended that unused pecuniary resources of a deceased veteran accumulated from pension funds, who left no dependents or heirs at law, should revert to the source from which they came to permit help for other veterans or to aid in reducing the necessary costs of the veterans' program. Surely it was never intended that left over funds arising from such contributions should become a windfall for any state by way of escheat.

A similar view has been expressed on statutory intent by the Appellate Division of the New York Supreme Court in *In re Hammond's Estate* (1956), 2 App. Div. (2d) 160, 161, 154 N.Y.S. (2d) 820, 822, quoting from *In re Price's Estate* (1951), 199 Misc. 833, 834, 104 N.Y.S. (2d) 518, 520, that it was the intent of Congress "that the State should not profit with respect to funds administered by the Veterans' Administration." We note that *Hammond* was affirmed by the New York Court of Appeals (1958), 3 N.Y. (2d) 567, 570-571, 147 N.E. (2d) 777, 778.

In *Hammond* the court also stated that "It is settled that section 450 and kindred Federal statutes are para-

mount to State law and are enforcible as attaching a valid condition to a gift."

In view of the federal legislative intent it must be said that in both equity and law any funds received by a veteran belong to him contingent upon his spending them or leaving heirs to inherit them; and, that federal moneys so received, if held within the broad definition of "funds" as we have observed, are in the status of a contingent gift with a right of reversion in the donor if the beneficiary thereof dies without heirs. This being so the laws of Colorado relating to the devolution of *personal* property can have no application.

We hold that the word "funds" as used in the Act of Congress in question includes the bonds remaining in this veteran's estate at the time of his death and which were purchased with his pension money.

The judgment is reversed and the cause remanded with directions to allow the escheat claim of the United States as to all of the net assets in the estate without diminution of costs incurred by the state in this proceeding.

MR. JUSTICE FRANTZ dissents.

MR. JUSTICE MOORE and MR. JUSTICE HALL not participating.

MR. JUSTICE FRANTZ dissenting.

There are three sufficient reasons why the property of the deceased pensioner should not revert to the United States. They are: 1) the government of the United States could not under the law, by subsequent legislation, alter or place conditions on moneys already received by way of pension, as it is urged was done in this case; 2) historically, the statute in question relates to money and the term "funds" should be construed to refer to money only; 3) the context of the Act clearly indicates that in using the term "funds" Congress had in

mind money in the form of currency or credit, and that it was the intention of Congress that the statute apply only to money.

1. In 1930 the United States enacted into the law a provision for the return to the United States of funds derived from pension benefits upon the death of a mentally incompetent veteran dying without heirs. In the instant case two bonds, each in the sum of one thousand dollars, had been acquired in 1929 from money accumulated from the veteran's pension, and were part of the assets of the estate at the time of the pensioner's death. Benefits received by the veteran prior to the 1930 enactment should be held unaffected by the subsequent legislation.

A matured installment of a pension is a vested right. And an installment properly received by a pensioner is taken under the statute as it then exists and the status of the installment cannot be altered or interfered with by subsequent amendments of the law under which the pension was created. Such is the law as enunciated in the case of *Moran v. Firemen's & Policemen's Pension Fund Commission of Jersey City*, 20 N.J. Misc. 479, 28 A. (2d) 885.

Certainly as to property acquired with money derived from a pension prior to the statute creating a reversionary interest in the United States, the decision of the majority is erroneous.

2. As already suggested, the first enactment providing for a reversion to the United States of funds derived from pension benefits upon the death of a mentally incompetent veteran who dies without heirs came into existence in 1930. I refer to Section 450 (3) Title 38 U.S.C. (Act July 3, 1930, Chapter 849). A perusal of the section will show that it is very similar to the present effective Act. The latter is quoted in the majority opinion.

In the second session of the 84th Congress in 1956, House Bill No. H.R. 10478 was introduced. This proposed

bill contained the words "any funds or property" in lieu of the term "funds" as now used in the Act. By reason of the retroactive effect of the bill and the use of the term "funds or property," it failed of passage. Hence, it would appear that historically the term "funds" had a very limited meaning and that Congress has so construed the word, i.e., that property other than funds was not to be affected.

3. Recognized as the best rule for the construction of statutes is the resort to the context of the legislation. The Section in question contains the term "funds" at least five times. "Any part not so paid and any funds of a mentally incompetent or insane veteran not paid to the chief officer of the institution * * * may be ordered held in the treasury to the credit of such beneficiary." Money clearly is referred to in this sentence of the Act, and it certainly does not mean that any bonds not paid to the "chief officer of the institution" may be held in the treasury. The next sentence reads: "All funds so held shall be disbursed under the order, etc. * * * " The term "disbursed" generally "has reference to the paying out or expending of moneys or currency." *Pacific Indemnity Co. v. Harper,* 14 Cal. (2d) 379, 94 P. (2d) 586, 124 A.L.R. 1169.

The succeeding sentence of the Act still speaks of the fund in the hands of the treasury to the credit of such beneficiary. Again, it is clear that the fund mentioned refers to money, for the sentence begins, "Any balance remaining in such fund." The last sentence in the Act directs that funds in the hands of the guardian shall escheat to the United States under certain circumstances "to the Veterans Administration, and shall be deposited to the credit of the applicable current appropriation." Considered in context the word "funds" again appears to refer to money, for this last sentence refers to where they shall be deposited, and it is crystal clear that "funds deposited" means "moneys deposited."

"[I]t is a fundamental rule of statutory construction

that every law is adopted as a whole, and a clause which standing alone might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law." *Martinez v. People,* 111 Colo. 52, 137 P. (2d) 690; *Carter v. Denver,* 114 Colo. 33, 160 P. (2d) 991.

"When any word is used having more than one meaning the sense in which it is employed *is to be gathered from the context* — and we think it impossible for any one to doubt as to the intention of the parties in this case. The term par funds, or New York funds, is as well understood as the term cash, and it would be a reproach to the law if its ministers could not understand that which is obvious to all the rest of the world." *Lacy v. Holbrook, Bowman & Co.,* 4 Ala. 88. (Emphasis supplied.)

I respectfully submit that the 1930 Act could not affect benefits received in any manner or property acquired prior to its enactment. I further submit that the term "funds" has, historically and by virtue of the context of the Act, a very limited meaning, to-wit: money or currency.