## No. C-1487

**Jeffrey I. Tompkins, as Special Administrator of the Estate of Jose Ruperto del Valle, Deceased v. Marie DeLeon and Linda DeLeon**

(595 P.2d 242)

Decided May 29, 1979.

J. Stephen Mullen, L. Dan Rector for petitioner.

James Robert Barash, Patric J. LeHouillier for respondents.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

We granted certiorari to consider the court of appeals' decision, 40 Colo. App. 241, 576 P.2d 563 (1977), interpreting the Dead Man's Statute. We reverse.

The respondents, Marie and Linda DeLeon, suffered bodily injuries on August 22, 1972 when an automobile owned and operated by Jose Ruperto del Valle struck their car from the rear. On September 19, 1973 del Valle died of a cause unrelated to the accident. Subsequently, the respondents sued the administrator of del Valle's estate. At the ensuing trial, respondents sought to testify concerning their pain, suffering and medical care during the time preceding del Valle's death. The trial court ruled that such testimony was barred by the Dead Man's Statute, section 13-90-102, C.R.S. 1973. Respondents were permitted to testify about events subsequent to del Valle's death, and the jury awarded damages based on that testimony.

On appeal, the respondents claimed that the damages were inadequate and would have been greater but for the district court's erroneous application of the Dead Man's Statute to preclude testimony about pain, suffering and medical care which occurred prior to del Valle's death. The court of appeals reversed, concluding that the statute was not intended to prevent the admission of testimony which the decedent could not have contradicted of his own knowledge. The cause was remanded for a new trial.

The only issue on appeal is whether the respondents testimony about pain, suffering and medical care occurring prior to del Valle's death should have been admitted. The statute reads as follows:

"(1) No party to any civil action, suit, or proceeding, or person directly interested in the event thereof shall be allowed to testify therein of his own motion or in his own behalf by virtue of section 13-90-101, when any adverse party sues or defends as the trustee or conservator of an idiot, lunatic, or distracted person, or as the executor or administrator, heir, legatee, or devisee of any deceased person, or as guardian or trustee of any such heir, legatee, or devisee, unless when called as a witness by such adverse party so suing or defending, and except in the following cases:

"(a)   In any such action, suit, or proceeding, a party or interested person may testify to facts occurring *after* the death of such deceased person." (Emphasis added) Section 13-90-102, C.R.S. 1973.

The statute then lists six more exceptions, none of which apply to this case.

The above quoted provisions were in effect long prior to the 1973 codification of our statutes. These provisions were clear and unambiguous. *Young v. Burke,* 139 Colo. 305, 338 P.2d 284 (1959); *Brantner v. Papish,* 109 Colo. 437, 126 P.2d 1032 (1942). They concerned the competency of witnesses. *Estate of Freeman v. Young,* 172 Colo. 322, 473 P.2d 704 (1970).

In the codification of the Colorado Revised Statutes 1973 the General Assembly reenacted the statute without change. Subsequently, it amended the statute as to subjects not relevant here and did not change the above quoted provisions. Colo. Sess. Laws 1975, ch. 251, 13-90-102 at 925; Colo. Sess. Laws 1977, ch. 200, 13-90-102 at 822. When the legislature reenacts or amends a statute and does not change a section previously interpreted by settled judicial construction, it is presumed that it agrees with judicial construction of the statute. *Crownover v. Gleichman,* 194 Colo. 48, 574 P.2d 497 (1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). *Music City, Inc. v. Estate of Duncan,* 185 Colo. 245, 523 P.2d 983 (1974); *Nye v. District Court,* 168 Colo. 272, 450 P.2d 669 (1969). *See Gushurst v. Benham,* 160 Colo. 428, 417 P.2d 777 (1966) in which the trial court ruled that the claimant was not permitted to testify to any events occurring prior to the death of a man who died eight months after the same automobile accident in which the claimant had been injured; and this court affirmed.

The statute clearly prevents the respondents from testifying regarding any events occurring prior to del Valle's death. The court of appeals' decision creates a judicial exception additional to those set forth in the statute and contradicts the purpose of subsection (a) thereof. As the statute is clear and unambiguous and as the competency of witnesses falls within the area of legislative prerogative, there is no room for judicial modification here.

The majority of the court of appeals relied in part upon the belief that admission of the contested testimony would not subvert the purpose of the statute. It may be correct that in this instance admission of the testimony might not have materially obstructed the purposes of the statute. Nonetheless, we agree with the dissenting opinion of the court of appeals that the courts have an obligation to apply the clear language of the statute.

The opinion of the court of appeals is reversed and the cause returned to it for remand to the district court showing our affirmance of the district court.

MR. JUSTICE ROVIRA specially concurs.

MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN dissent.

MR. JUSTICE ROVIRA specially concurring:

When statutory language is unequivocal, as in this instance, common sense dictates that it not be read into, but out from. The philosphy expressed by the dissent is an argument better made to the legislature.

Professor McCormick, as quoted in the dissent, has recognized that it is the statute-makers who must initiate any change in survivors' evidence acts and has suggested alternative solutions which could be utilized by the legislature.

In view of the clarity of the statutory language, and with any fair reading of it, reversal is required. Respect for the English language demands it. A due regard for separation of powers warrants it.

MR. JUSTICE CARRIGAN dissenting:

I respectfully dissent.

In interpreting a statute, a court's primary duty is to discern and give effect to the intent of the legislature in adopting that statute. As Judge Sternberg noted in his well reasoned and sensible court of appeals' majority opinion, this court has previously recognized that:

"[W]here a statute would operate unjustly, or absurd consequences would result from a literal interpretation of terms and words used that would be contrary to its obvious and manifest purposes, the intention of the framers will prevail over such a literal interpretation." 40 Colo. App. 241, 243, 576 P.2d 563, 564 (1977), quoting *People v. Silvola,* 190 Colo. 363, 369, 547 P.2d 1283, 1288 (1976).

The General Assembly's own canons for statutory construction direct that courts, in construing statutes, presume that "a just and reasonable result is intended . . . ." Section 2-4-201(1)(c), C.R.S. 1973. The court of appeals' interpretation of the "Dead Man's Statute" in this case admirably applies both this legislative directive and our own.

The majority of this court, however, feels compelled to adopt a strict, literal application of the opening paragraph of the "Dead Man's Statute." In my view, that literal adherence to the form of the words used stifles the spirit, substance and purpose of the statute: to facilitate justice rather than injustice. The effect of the majority opinion is to extend the statute's prohibition beyond its original purpose of precluding the surviving party to a transaction or conversation from possibly biased or untrue testimony where the other party's death prevents rebuttal. The contrary legislative intent is clearly revealed by reading the whole statute, and especially by considering the stated exceptions for the light they shed on the purpose of the general rule.

*Gushurst v. Benham,* 160 Colo. 428, 417 P.2d 777 (1966) has been cited as authority requiring the result reached by the majority. Careful

reading of that opinion, however, discloses that it contains no interpretation by this court of the Dead Man's Statute, nor is there even any issue discussed which could have evoked a holding of precedential value regarding the statute. Certainly the issue here involved was not before the court in *Gushurst.*

We are, therefore, required to apply the familiar rules of statutory construction to determine whether the evidence in question should have been excluded or admitted. In approaching this task we should bear in mind the modern view that the truth-finding process is more likely to be aided by admitting evidence than by excluding it. In this context the issue is whether the truth is more likely to be forthcoming if the primary (perhaps the only) witness to it is allowed to testify, or if that witness is rendered dumb because one not even present when the pain in question was endured has died.

The cardinal goal of statutory interpretation is to discover the legislature's intent, and the primary factors to be considered include: (1) the cause, necessity or reason giving rise to the statute, (2) the object, purpose or goal of the legislature, and (3) the evil the statute was intended to remedy. *In re Pilch's Estate,* 141 Colo. 425, 348 P.2d 706 (1960).

While the majority's good faith purpose to give meaning to what it perceives to be the statute's plain words, and thus to avoid judicial usurpation of legislative functions, is commendable, I submit that it is misguided and self-defeating in these circumstances. Rigid adherence to literal wording of one portion of a statute, without reference to the entire statute's history, purpose or context, may itself so violate the statute's intent as to usurp legislative authority.

"Judicial frustration, if not usurpation, of legislative authority, may be the result of reflexive judicial construction arrived at exclusively by considering the language of the statute on the basis of the judge's own received impressions as to what the language means, without regard for the purpose of the act and other aids to interpretation." 2A Sands, *Sutherland Statutory Construction* §45.09 (4th Ed. 1973).

Thus where the spirit or legislative intent of a statute appears, that becomes the dominant factor in construing the statute. *Rupp v. Hill,* 149 Colo. 48, 367 P.2d 746 (1962). The notion that the spirit of the law should breathe the life of meaning into the letter of the law is certainly not novel. It recurs throughout history and literature. Indeed the Bible teaches that "the letter killeth, but the spirit giveth life." (II Corinthians 3:6).

Thus where a narrow or literal interpretation of terms used in a statute would cause it to operate unjustly or produce absurd consequences, the intent of the framers, as gathered from the *whole statute,* should prevail. *Murray v. Hobson,* 10 Colo. 66, 13 P. 921 (1887). *See also People v. Texas Co.,* 85 Colo. 289, 275 P. 896 (1929). The vital essence of every statute is its intent, and courts have a duty, in construing a statute, to

ascertain the legislature's purpose and intent in passing it, then give the statute a construction that will render it effective to accomplish that purpose. *Martinez v. People,* 111 Colo. 52, 137 P.2d 690 (1943). *See also Posey v. District Court,* 196 Colo. 396, 586 P.2d 36 (1978) (in construing statutes, "legislative intent is the polestar.") *Cf. People in the Interest of Y.D.M.,* 197 Colo. 403, 593 P.2d 1356 (1979) (constitutional interpretation).

In this case the court of appeals' majority carefully analyzed the statute in light of its manifest purpose: to render inadmissible testimony relating to a transaction or conversation with a decedent where the proffered witness and the decedent's estate are both parties to the action. The majority of this court, on the other hand, has construed the statute to exclude evidence not intended to be excluded, evidence which could not have been rebutted by the decedent had he lived, evidence of a kind not within the rationale for which the statute sanctions exclusion, evidence whose exclusion produced an injustice not intended or required by the statute.

When one reads the *whole* statute, it is palpably obvious from subsections 13-90-102(a), (b), (c), (d), (e), (f) and (g) that the General Assembly's purpose was to prevent a litigant who had been a party to a *conversation, transaction* or *admission* involving a deceased party from taking unfair advantage of that party's death. Obviously where only party to a conversation or transaction survives, that party's testimonial version of the occurrence cannot be disputed from the grave by the deceased party.

The statute is intended, therefore, to protect those whose interests would be adversely affected because death has sealed the lips of the party to a conversation or transaction under whom they claim their interest in the litigation. But it is plainly not intended to apply, as the majority has applied it, to bar testimony regarding events which occurred outside the decedent's presence and as to which he could not have testified, had he survived. The statute's prophylactic purpose is fully served by rendering the survivor of a two-sided transaction or conversation incompetent to testify regarding one side of that interchange without rendering him incompetent to testify on other relevant matters as to which the decedent had no knowledge.

Today's majority opinion extends the statute far beyond its intended function as a shield against one-sided accounts of conversations and transactions with decedents. Indeed, the majority opinion excludes otherwise relevant and material evidence which is not dependent on or related to any utterance or action of the decedent. This could not have been the legislative intent.

Here the testimony involved did not touch on any aspect of any conversation, transaction or admission in any way involving the decedent. No conduct or utterance of the decedent was in issue. The facts sought to be

proved by the proffered evidence related solely to pain endured by the plaintiffs outside the decedent's presence. His death was totally irrelevant to all evidence of the matters sought to be proved. The effect was to limit the jury to awarding only part of the damages to which the plaintiffs were entitled. While half-justice may be better than no justice at all, we cannot ignore the reality that when a court award is half justice it is also half injustice.

Whether the legislature has power for an irrelevant reason to preclude a witness from giving material testimony in a court trial raises serious issues touching the constitutionality of the statute. Those issues are avoided entirely by the court of appeals' interpretation. But this court's majority opinion sets the stage for a constitutional attack on the statute, for today's literal application may deprive a deserving litigant of *any* access to the courts, or, as in this case, may frustrate the right to be fairly compensated for an injury. The question well may be raised whether the statute, as today interpreted, violates the state constitution by barring the courthouse door to one party in the hope of protecting another from presumed, but probably non-existent, perjury.

Our state constitution clearly guarantees that:

"Courts of justice shall be *open* to *every person*, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, *denial* or delay." *Colo. Const.*, Art. II, §6. (Emphasis added.)

Other respected courts have followed reasoning similar to that of our court of appeals. Those courts are of the view, which I share, that such an interpretation fully enforces the statute's intent while obviating the injustice unavoidably incident to the construction adopted by this court's majority. *See, e.g., Zeigler v. Moore,* 115 Nev. 91, 335 P.2d 425 (1959); *Foster v. Englewood Hospital Ass'n,* 19 Ill. App. 3d 1055, 313 N.E.2d 255(1974); *Stathas v. Wade Estate,* 251 Pa.Super. 269, 380 A.2d 482 (1977).

With all due respect, I cannot accept the majority opinion's keystone premise that the legislature has — in effect — approved this court's prior restrictive interpretations of the statute by having reenacted it while codifying the statutes as a whole, or by having added one liberalizing amendment. To me this is merely a method of passing on to the legislature the responsibility for correcting this court's past mistakes which happened to occur before some legislative reenactment or codification. The whole doctrine is founded on a fiction as transparent as the "no clothes" worn by the emperor in the familiar fable. To assume that the 100 members of the Colorado General Assembly, nearly all of whom are non-lawyers, assiduously read and understand the opinions of this court on matters as complex as this, then make an informed choice whether or not to overrule each decision, strains credulity. Common law ought not abandon common

sense.

Courts in interpreting statutes affecting admissibility of evidence in trials should not forget that the purpose of evidence rules is to facilitate, not to obstruct, justice. Certainly it is no more likely that justice will be frustrated if one party is allowed to testify than if both are rendered mute by the death of one.

A brief review of the phenomenon known as the Dead Man's Statute and the criticisms directed toward it by legal scholars provides further persuasion that the courts should not extend such statutes to exclude evidence not within the scope of their purpose. Such a review hopefully, may bolster the only constructive function of the majority opinion, to attract the attention of one or more legislative leaders to the need for reform.

Our Dead Man's Statute, like others, is a vestigial remnant of the ancient court-made rule that any party having an interest in a lawsuit was incompetent to testify in that action. That rule was apparently based on the fear that a party's financial interest in the outcome would induce perjury. The same rather perverse — if not paranoid — view of human nature underlies the Dead Man's Statute.

Such statutes have been universally condemned by legal scholars as having created far more injustice than they have prevented. For example, Dean Wigmore in his monumental treatise, states:

"The argument . . . that a contrary rule 'would place in great peril the estates of the dead' sufficiently typifies the superficial reasoning on which the rule rests. Are not the estates of the living endangered daily by the present rule, which bars from proof so many honest claims? Can it be more important to save dead men's estates from false claims than to save living men's estates from loss by lack of proof?

"The truth is that the present rule is open, in almost equal degree, to every one of the objections which were successfully urged nearly a century ago against the interest-rule in general. Those objections may be reduced to four heads: (1) That the supposed danger of interested persons testifying falsely exists to a limited extent only; (2) That, even so, yet, so far as they testify truly, the exclusion is an intolerable injustice; (3) That no exclusion can be so defined as to be rational, consistent, and workable; (4) That in any case the test of cross-examination and the other safeguards for truth are a sufficient guaranty against frequent false decision. Every one of the first three objections applies to the present rule as amply as to the old and broader rule. The fourth applies with less apparent force, because the opponent's testimony is lacking in contradiction. And yet, upon what inconsistencies is based even this support for the rule! . . . .

"There never was and never will be an exclusion on the score of interest which can be defended as either logically or practically sound. Add to this, the labyrinthine distinctions created in the application of the complicated statutes defining this rule; and the result is a mass of vain quiddities which

have not the slightest relation to . . . testimonial trustworthiness . . . ."
II Wigmore, *Evidence* §578 (3d Ed. 1940).

Another leading scholar, Professor McCormick, has been equally critical:

"Most commentators agree that the expedient of refusing to listen to the survivor is, in the words of Bentham, a 'blind and brainless' technique. In seeking to avoid injustice to one side, the statute-makers have ignored the equal possibility of creating injustice to the other. The temptation to the survivor to fabricate a claim or defense is obvious enough, so obvious indeed that any jury will realize that his story must be cautiously heard. A searching cross-examination will usually, in case of fraud, reveal discrepancies inherent in the 'tangled web' of deception. In any event, the survivor's disqualification is more likely to balk the honest than the dishonest survivor. One who would not balk at perjury will hardly hesitate at suborning a third person, who would not be disqualified, to swear to the false story.

"Slowly, the lawmakers are being brought to see the blindness of the traditional survivors' evidence acts, and liberalizing changes are being adopted. A few states have provided that the survivor may testify, but his testimony will not support a judgment, unless corroborated by other evidence. Others authorize the trial judge to permit the survivor to testify when it appears that his testimony is necessary to prevent injustice. Both of these solutions have reasonably apparent drawbacks which are avoided by a third type of statute that sweeps away the disqualification entirely and permits the survivor to testify without restriction, but seeks to minimize the danger of injustice to the decedent's estate by admitting any writings of the deceased or evidence or oral statements made by him, bearing on the controversy, both of which would ordinarily be excluded as hearsay." McCormick, *Evidence* §65 (2d Ed. 1972).

*See also* Chadbourn, "History and Interpretation of the California Dead Man Statute: A Proposal for Liberalization," 4 *U.C.L.A. L.Rev.* 175 (1957); Note, "The Colorado Dead Man's Statute," *Denver L. J.* 349 (1966).

The above scholarly criticisms, of course, are directed to the policy underlying such statutes. These criticisms, therefore, are directed at the legislative branch, not the courts. I cannot believe that the majority of this court would have inflicted the obvious injustice resulting from today's decision if they did not believe that the General Assembly's action compelled this result. Although I respectfully disagree with their premise that they are precedent-bound, I am hopeful that a fair-minded General Assembly will give early consideration to the problem exemplified in this case.

Since I cannot accept the premise that we have no choice other than that reached by the majority, I would affirm the decision of the court of appeals for the reasons set out in that court's excellent majority opinion.

MR. JUSTICE ERICKSON has authorized me to state that he joins in this dissent.