**Jan HEIMER, Petitioner–Appellant,**

v.

**BOARD OF EDUCATION, ADAMS COUNTY–WESTMINSTER SCHOOL DISTRICT 50, Respondent–Appellee.**

No. 93CA0950.

Colorado Court of Appeals, Division III.

Aug. 25, 1994.

As Modified on Denial of Rehearing Oct. 27, 1994.

Certiorari Granted April 24, 1995.

Martha R. Houser, Gregory J. Lawler, Cathy L. Cooper, Sharyn E. Dreyer, Aurora, for petitioner-appellant.

Semple & Jackson, P.C., Martin Semple, Patrick B. Mooney, Denver, for respondent-appellee.

Opinion by Judge CRISWELL.

Petitioner, Jan E. Heimer, seeks review of the order of the respondent, Adams County School District No. 50, that dismissed her as a non-probationary teacher with the district. Her petition requires us, for the first time, to interpret and to apply the new standard for our review of such decisions that was adopted in 1990 and is contained in § 22–63–302(10)(c), C.R.S. (1993 Cum.Supp.). Because our review of the record as a whole convinces us that the hearing officer's recommendation has more support in the record than does the decision of the school district's board of education, we affirm that recommendation and remand the cause to the board with directions to reinstate Heimer to her status as a non-probationary teacher.

Heimer had been a teacher for 28 years prior to the hearing in this case; for 25 of those years, she had taught home economics at one of the district's middle schools. The record indicates that she is well-liked by her students and is considered a good teacher by her peers.

However, in December 1992, the district's superintendent filed written charges against Heimer pursuant to the Teacher Employment, Compensation, and Dismissal Act of 1990, §§ 22–63–101 to 22–63–403, C.R.S. (1993 Cum.Supp.) (the new statute), and recommended Heimer's dismissal. These charges asserted that (1) Heimer's classroom instruction had been "consistently ... deficient"; (2) her "long and short range planning" had been "consistently ... deficient"; (3) she had been "consistently deficient" in her classroom management; (4) she had been "deficient in her interpersonal relationships"; (5) she had "failed and/or refused to cooperate with or follow directives of her supervisors"; and (6) she had failed or refused to cooperate with school administrators who were attempting to assist her in the performance of her job responsibilities. The charging document asserted that these deficiencies, failures, and refusals constituted "incompetency, neglect of duty ... unsatisfactory performance, insubordination ... or other good and just cause" for Heimer's dismissal within the meaning of § 22–63–301, C.R.S. (1993 Cum.Supp.).

Heimer objected to these charges and requested an evidentiary hearing in accordance with § 22–63–302(3), C.R.S. (1993 Cum. Supp.). A hearing officer was selected, and the parties engaged in a nine-day evidentiary hearing during the course of which numerous witnesses were heard and numerous documents were considered by the hearing officer.

After completion of this hearing, the hearing officer issued a 29–page, single-spaced decision which contained his findings of fact and recommendation. In that decision, the hearing officer rejected allegations that Heimer was incompetent and found, as a fact, that the evaluation system used to judge Heimer's performance, while not improper generally, was used by her superiors in such

a biased, prejudicial, and unreasonable manner that it lacked credibility. Hence, the hearing officer found that the district had failed to sustain its burden of proof that Heimer's performance was unsatisfactory.

The hearing officer did find that Heimer had failed to follow certain directives from her superiors in some instances and that she had neglected certain of her teaching duties. He determined, however, that these derelictions were relatively minor and would not justify her termination.

Among the hearing officer's specific findings were the following:

From the time that Heimer commenced teaching home economics at the middle school where she was employed until early in the 1989–1990 school term (a period in excess of 20 years), Heimer's evaluations had consistently been "very strong," although suggestions for minor corrections had been made. The narrative descriptions of Heimer's performance contained in these evaluations noted that some of her strengths were in those very areas in which the charges at issue alleged that she was "consistently" deficient. Included in these evaluations was one by her then middle school principal in 1988 in which he concluded that Heimer displayed excellent performance in certain aspects of her teaching and which contained no recommendations for improvement. As late as June 1989, an assistant principal who had been selected to evaluate Heimer for the forthcoming year had concluded that, without exception, she met all of the district's performance standards.

In August 1989, however, the school's new principal advised Heimer that a second home economics teacher position was to be eliminated and that three other teachers (none of whom was certified in home economics) were to assume that other teacher's duties. Heimer was upset by this because she believed that the students would not receive quality instruction. The principal sent a written memorandum to Heimer (which she considered to be a reprimand) stating that the decision to replace the other home economics teacher was final and that Heimer was expected to cooperate.

Starting a few days after this incident, the principal went into Heimer's classroom to observe her on eight occasions in about 15 calendar days. She took contemporaneous notes respecting Heimer's performance. At the hearing, however, the principal testified to several alleged deficiencies in Heimer's performance that were not reflected in her contemporaneous notes.

The principal then removed the assistant principal who had previously been delegated the responsibility for evaluating Heimer's performance and who had found her performance to be satisfactory from that function. The principal also directed Heimer to submit daily lesson plans and to have daily conferences with her or her designee.

The hearing officer found that, even crediting the principal's testimony with respect to the deficiencies that she had allegedly observed, the directives given Heimer constituted an excessive reaction by the principal. He also found that, given Heimer's length of service with the district and past positive record of performance, it could reasonably have been anticipated by the principal that Heimer would resent the principal's directive for extensive paperwork and conferences and might, as a result, fail willingly to address any deficiencies that might exist. The hearing officer also found that the principal's evaluations and conclusions were flawed by bias on her part and that they lacked objectivity.

At the end of the school year in June 1990, the principal issued an evaluation determining that Heimer was deficient in 19 out of 38 evaluating categories (in contrast to the June 1989 annual evaluation, which found her deficient in none). However, because of the principal's "unfairness and lack of objectivity," the hearing officer found that this evaluation was neither "credible nor reliable."

In the following school year, 1990–1991, because of concerns expressed with respect to the principal's objectivity, another assistant principal was assigned to evaluate Heimer. At the end of that year, this evaluator issued a summative evaluation, concluding that Heimer needed improvement in only two of the 38 evaluating categories.

At the hearing, this assistant principal testified to several deficiencies that were not noted on her written evaluation. In addition, her testimony was inconsistent, in part, with statements respecting Heimer's performance that she had made before the hearing. Finally, this assistant principal gave no suggestions to Heimer during her periodic evaluations as to how she might improve. Given these considerations, the hearing officer determined that it would be unfair to credit this assistant principal's testimony when the contemporary evaluation provided to Heimer disclosed "a completely different assessment" of the quality of Heimer's performance.

In the 1991–1992 school year, the principal appointed another assistant principal to evaluate Heimer, asked three other administrators to observe her performance on occasion, and utilized another teacher in a "peer pair-up program."

The principal and assistant principal were critical of Heimer's performance during this peer pair-up program. In contrast, the peer teacher involved concluded that the lessons taught by Heimer during this process went well, and she saw nothing in Heimer's performance that she considered deficient.

During this period, the assistant principal assigned to evaluate Heimer required her to submit detailed daily lesson plans and to attend regular conferences with the evaluator. Informal observations of Heimer's performance were made three times per week, in addition to observations made by administrators from other schools. The plans Heimer submitted in response to this requirement admittedly did not contain all of the details required. However, the hearing officer found that, in light of the failure of the district to demonstrate any prior performance deficiencies by Heimer, the onerous requirement of a daily lesson plan was unreasonable.

In September 1992, the principal delivered Heimer's formal evaluation for the 1991–1992 school year, in which Heimer was found to be satisfactory in only six of the 22 rating categories established by a new evaluation form. Generally, Heimer considered this evaluation to be incorrect.

At about this time, the principal presented a "target improvement plan" to Heimer requiring, among other things, the submission of detailed short range and long range lesson plans, as well as daily lesson plans which were required to contain specific reference to several factors. The hearing officer found that the plans submitted by Heimer in response to this requirement were "more than adequate" for a teacher with Heimer's experience. The plans submitted by her, however, were returned to her, and the comments made with respect to those plans were, in several instances, "picky." However, Heimer failed to submit any corrected plans.

In November 1992, the principal issued another evaluation in which she concluded that Heimer had failed to meet the district's performance standards in 18 out of 22 categories. The hearing officer found that this evaluation was suspect in light of the principal's history of bias and lack of objectivity with respect to Heimer. This was the evaluation, however, that led to the charges that were filed against Heimer the following month.

The hearing officer concluded that, because of the principal's prejudice against Heimer, she had been treated unfairly and that the claims of deficient performance by Heimer were not supported by any credible evidence or were simply inaccurate or untrue. Hence, he concluded that the evidence did not support any charge that Heimer was incompetent or had rendered unsatisfactory service.

With respect to the charge of insubordination, the hearing officer found that, while Heimer did not perform all of the requirements demanded of her, many of the demands made upon her were unreasonable and her failure to comply with those demands could not be considered insubordination. He also concluded, however, that two of the directives (to provide written class rules for her students and not to leave students unattended) were reasonable and were, on occasion, not followed by Heimer.

Similarly, the hearing officer concluded that Heimer had been neglectful of her duties by failing to abide by the above two directives, by not consistently preventing stu-

dents from throwing towels over food into a dirty towel bin, by failing on one occasion to notify parents of grade changes, and by failing properly to attend to the home economics budget and to file food requisitions on time. However, he found, with respect to these latter neglects, that Heimer had had a higher standard imposed upon her than had been imposed upon other home economics teachers. He also determined that, because Heimer had expressly agreed to comply with the terms of the last improvement plan, her failure to prepare and present detailed lesson plans constituted a neglect of duty, albeit that the improvement plan was based upon the faulty conclusion that Heimer's performance was deficient.

With respect to these findings of insubordination and neglect of duty, however, the hearing officer determined that such conduct did not "materially and substantially affect her performance." Hence, because the "major reasons" for Heimer's dismissal had not been established and because her failure to comply with the improvement plan in the fall of 1992 was necessarily "intertwined with the history of events," he recommended that she be retained as a teacher.

The district board of education reviewed the hearing officer's recommendation, and in a written resolution, it ordered that Heimer be dismissed. Referring to certain specific findings made by the hearing officer, this order gave as the board's essential reason for rejecting the hearing officer's recommendation that:

> Jan E. Heimer's insubordination and neglect of duty were not corrected over a period of nearly three years despite intensive efforts made by her supervisors and others, and the Board of Education determined that such conduct is detrimental to the educational process in this School District.

The board's order made no reference to the hearing officer's findings respecting the bias and prejudice of some of Heimer's superiors nor to the unfairness of the manner in which the hearing officer had found Heimer had been treated.

## I.

The proceedings here are governed by the new statute, which replaced the former act, the Teacher Employment, Dismissal, and Tenure Act of 1967, § 22–63–101, C.R.S. (1988 Repl.Vol. 9) (the old statute), in 1990. The new statute re-enacted some of the provisions that were contained in the old statute, but it also made substantial amendments to the old statute. Significant to our analysis here, a comparison of the two statutes discloses the following:

First, there are certain procedural differences between the old statute and the new statute. Thus, under the old statute, the party who was to conduct the hearing was an administrative law judge from the state department of administration. Section 22–63–117(5), C.R.S. (1988 Repl.Vol. 9). Under the new statute, a hearing officer, either mutually agreed upon by the parties or selected from a list prepared by the chief judge of the local judicial district, conducts the hearing. Section 22–63–302(4)(a), C.R.S. (1993 Cum. Supp.).

However, both the old statute and the new statute, either expressly or by implication, require that the presiding officer be "impartial," *see* § 22–63–302(4)(b), C.R.S. (1993 Cum.Supp.); that the presiding officer review the evidence and testimony and make written findings of fact with respect thereto, § 22–63–117(8), C.R.S. (1988 Repl.Vol. 9) and § 22–63–302(8), C.R.S. (1993 Cum.Supp.); and that the board of education review the presiding officer's findings of fact and recommendation and enter a written order. Section 22–63–117(10), C.R.S. (1988 Repl.Vol. 9); § 22–63–302(9), C.R.S. (1993 Cum.Supp.).

These provisions have previously led our supreme court to conclude that the impartial fact finder's determination of evidentiary facts is binding on the board and that the board has no authority to engage in any evidentiary fact finding. However, under the old statute, so long as the board's decision was supported by the hearing officer's findings of fact, the board retained the authority to reject the fact finder's recommendation and to substitute its own "ultimate findings." *Blair v. Lovett*, 196 Colo. 118, 582 P.2d 668 (1978).

■ Under the new statute, the board also retains the authority to reject the hearing officer's recommendation to retain the teacher. If it does so, however, it must "make a conclusion, giving its reasons therefor, which must be supported by the record, and such finding shall be included in its written order." Section 22–63–302(9), C.R.S. (1993 Cum. Supp.). This language re-affirms the responsibility of the board to state its reasons for disagreeing with the fact finder that was also imposed upon it by the old statute. *See Blaine v. Moffat County School District Re No. 1*, 748 P.2d 1280 (Colo.1988).

Second, under the old statute, a teacher could obtain a review by this court of the board's action through "appropriate proceedings under § 24–4–106(11), C.R.S. [the Administrative Procedure Act]." Section 22–63–117(11), C.R.S. (1988 Repl.Vol. 9). Under that statute, the question on review was, generally, whether the board's decision was arbitrary, capricious, or otherwise illegal. *See* §§ 24–4–106(7) and 24–4–106(11)(e), C.R.S. (1988 Repl.Vol. 10A). Hence, if the board's ultimate determination was supported by substantial evidence, as reflected solely by the administrative law judge's findings of fact, its order was required to be affirmed. *Ricci v. Davis*, 627 P.2d 1111 (Colo.1981).

■ The new statute, on the other hand, contains language that is significantly different from that found in the old statute. Section 22–63–302(10)(c), C.R.S. (1993 Cum. Supp.) provides that our review of the board's order of dismissal "shall be based upon the record before the hearing officer." If the order of dismissal is in accordance with the hearing officer's recommendation, then our review is designed simply "to determine whether the action of the board was arbitrary or capricious or was legally impermissible."

In contrast, if the board's order of dismissal is, as here, contrary to the hearing officer's recommendation of retention, § 22–63–302(10)(c) directs that:

> [T]he court of appeals shall either affirm the decision of the board or affirm the recommendation of the hearing officer, based upon the court's review of the record

as a whole and the court's own judgment as to whether the board's decision or the hearing officer's recommendation has more support in the record as a whole.

The district insists that this change in the language of the statute worked no substantial change in the standard of review that we are to use. It argues that the board's decision is still entitled to deference and that, unless the board's order demonstrates that its action was arbitrary, capricious, or otherwise illegal, we must affirm it. We disagree.

We note that the new statute has deleted any reference to the Administrative Procedure Act, which is the statute that created the standard for review under the old statute. Further, in describing the review which this court is to undertake under the new statute, the General Assembly has required us to "review the record" and then, based on our review of that record and the exercise of our "own judgment," to determine "whether the board's decision or the hearing officer's recommendation has more support in the record as a whole."

Contrary to the district's assertions here, this language simply will not admit of the concept that, in the case of disagreement between the hearing officer and the board, we are to defer to the board of education and to affirm its decision, absent some arbitrary, capricious, or illegal action on its part. While there may be a legitimate issue with respect to the exact meaning of the new statute, the legislative intent to *change* the standard of review from that adopted by the old statute is evident. *See Snyder v. Jefferson County School District R–1*, 842 P.2d 624, 630 (Colo.1992) ("The two appellate standards [described in the old and new statutes] differ . . . .").

The new statute, however, does not explain in any detail the manner in which our review of the record and our comparison of the hearing officer's recommendation against an inconsistent board decision is to be made. Nevertheless, our analysis of the new statute leads us to conclude that our consideration of the issue should involve the following process:

Except to the extent that there is a claim that the evidence submitted is legally insufficient to support the hearing officer's findings of fact, we are required to accept those findings as binding. The General Assembly did not change the statute's language respecting the function and authority of the fact finder, and it was that language upon which our supreme court relied in concluding that such findings are binding. Such legislative inaction evidences approval of the court's conclusion. *See Tompkins v. DeLeon,* 197 Colo. 569, 595 P.2d 242 (1979). Further, while an appellate court can determine the legal sufficiency of the evidence presented, it is impossible for such a court to engage in the type of credibility resolutions that a fact finder, who has observed and heard the witnesses, must make. *See Gosch v. Gomez,* 168 Colo. 296, 450 P.2d 1016 (1969).

Hence, our review of "the record" must consist of the review of the hearing officer's findings only, unless one of the parties asserts that one or more of those findings lack evidentiary support. In that case, we must canvass the transcript of the testimony and the other evidence only to the extent necessary to determine the validity of that assertion.

Under the new statute, we must then proceed to compare the conclusions (or ultimate facts) adopted by the board of education with the hearing officer's supported findings of fact. If the board's conclusions are not supported by such findings, the board's decision must be vacated.

If, on the other hand, both the conclusions of the hearing officer and those of the board are rationally supported by those findings, we will be required to compare and to balance the force of each body's conclusions.

This is the process, then, that the new statute requires us to employ in our review of a board of education's decision that conflicts with the hearing officer's recommendation.

## II.

The district also argues that, even if the General Assembly intended that this court should weigh the respective merits of the hearing officer's recommendation and the ultimate order of the board, we are, nevertheless, required, as a matter of constitutional law, to defer to the board's decision and to give it the greater weight. We disagree.

In making this assertion, the board places its reliance upon Colo. Const. art. IX, § 15, and a statute, § 22–32–110(1)(h), C.R.S. (1988 Repl.Vol. 9). Such reliance is misplaced.

Colo. Const. art. IX, § 15, requires the General Assembly to provide for the organization of school districts throughout the state and for the creation of local boards of education as the governing bodies for such districts. It then provides that:

Said directors [of the boards] shall have control of instruction in the public schools of their respective districts.

However, this constitutional provision must be read in conjunction with Colo. Const. art. IX, §§ 1 and 2. These latter provisions place "[t]he general supervision of the public schools" in the hands of a state board of education, whose powers and duties are to be "prescribed by law." Colo. Const. art. IX, § 1. In addition, the responsibility for providing for "the establishment and maintenance of a thorough and *uniform* system of free public schools throughout the state" is vested specifically in the General Assembly. Colo. Const. art. IX, § 2 (emphasis supplied).

Given these broad powers vested within the General Assembly, our supreme court has held that school districts "are subdivisions of the state and are created only through legislative authority." *Hazlet v. Gaunt,* 126 Colo. 385, 397, 250 P.2d 188, 194 (1952). And, it has strongly implied, if it has not decided, that no policy of a local school board can validly conflict with any state statute. *See Adams County School District No. 50 v. Dickey,* 791 P.2d 688 (Colo.1990).

In pursuit of its constitutional mandate to establish and maintain a uniform, state-wide system of public education, the General Assembly has traditionally laid down substantive and procedural criteria for the termination of teachers and for the judicial review of such termination decisions. Until now, no

one has suggested that a local school board's right to control "instruction" within the district, which is subject to the supervision of the state board of education pursuant to laws adopted by the General Assembly and subject to the requirements of a "thorough and uniform system" as decreed by the General Assembly, somehow limits the General Assembly's authority in this respect. Given the nature of these constitutional requirements, we reject such an argument.

In reaching this conclusion, we cannot help but note that the concept that the courts should be the ultimate tribunal in school district employment disputes is not a novel one. Some other states authorize their courts, in determining the propriety of a teacher dismissal, to engage in a strictly *de novo* hearing of the issue. *See generally* 2 J.A. Rapp, *Education Law* § 6.16[3][b][iii] (1992). In such instances, it is the court that determines the merits of the controversy, and no presumption of correctness attaches to the board's decision. *See Saunders v. Anderson,* 746 S.W.2d 185 (Tenn.1987); *Cooper v. Williamson County Board of Education,* 746 S.W.2d 176 (Tenn.1987).

■ Further, § 22–32–110(1)(h), C.R.S. (1988 Repl.Vol. 9), which grants to the respective local boards of education the power "[t]o discharge or otherwise terminate the employment of any personnel," does not constitute a grant of absolute authority. Rather, the authority granted by that statute is subject to, and must be exercised in accordance with, the more specific statutes respecting teacher terminations, the latest version of which was adopted after the enactment of § 22–32–110(1)(h). *See In re M.S. v. People,* 812 P.2d 632 (Colo.1991).

Under the old statute, our supreme court, in concluding that the board of education retained the authority to adopt "ultimate" findings of fact, relied, in part, upon the authority granted to the board by § 22–32–110(1)(h). In doing so, however, the court emphasized that nothing within the old statute reflected a legislative intent to remove the ultimate decision-making authority from the board. *Blair v. Lovett, supra.*

Here, however, there is clear legislative intent to require the judiciary to determine whether it is the hearing officer's recommendation or the board's decision that finds more support in the record. To this extent, therefore, the authority granted by § 22–32–110(1)(h) has been restricted by the new statute in a way that the board's authority had not been restricted at the time of the *Blair* decision.

## III.

■ Using the standard for review that the new statute requires us to employ, we conclude that the hearing officer's decision has more support in the record than does the board's decision.

Neither the board nor Heimer argues that any of the hearing officer's findings of fact are not supported by the evidence. Hence, we have limited our review of the record to a review of those findings.

Further, because the hearing officer determined that Heimer did, in fact, engage in certain acts of insubordination and neglect of duty, we cannot say that the board's decision is not legally supported by those findings or that no reasonable person could reach the conclusion that Heimer should be terminated. Hence, we cannot conclude that the board's ultimate determination must be vacated because it lacks any *legal* foundation.

Our conclusion that the hearing officer's recommendation finds more support in the record than does the board's decision is based upon our consideration of several factors, as follows:

First, Heimer has been a productive and well-respected member of the district's teaching staff for a period of some 25 years, during which period it was consistently determined that she was meeting all of the responsibilities that her position imposed upon her. That long record of good service should itself serve as a mitigating factor in considering the nature and seriousness of her recent derelictions. Indeed, considered against her prior employment record, Heimer's recent violations can be looked upon as aberrational behavior rather than evidence of the manner in which she normally acts.

Second, Heimer's violations did not implicate any important public policy that required strict enforcement. Leaving middle school students unattended on occasion, not uniformly prohibiting them from throwing towels in an inappropriate way, failing to respond in the detail required by a directive for lesson plans, which directive was itself unreasonable, or failing to meet the guidelines for preparing and submitting a home economics class budget (which guidelines were more strict than those established for other teachers) can hardly be classified as actions that are *malum in se.* On the contrary, compared to the serious allegations of incompetency and lack of performance originally laid against Heimer, they assume an aspect of insignificance.

Third, the hearing officer found, as a fact, that the principal's directives to Heimer, which resulted from that supervisor's bias and prejudice against Heimer, were such that any teacher of Heimer's status and experience would have reacted in a similar manner. Yet, nowhere in the board's detailed explanation of the reasons for its decision to terminate Heimer is there to be found a single word commenting upon the biased and prejudiced manner in which Heimer was treated. Such absence is extraordinary in light of the hearing officer's observation that Heimer's actions and reactions had to be judged against this history of bias and prejudice. From the board's decision, however, it would appear that the board gave no consideration to the principal's unwarranted actions taken against her. Instead, by its reference to the principal's "intensive efforts," the board appears to have approved of and ratified those "efforts."

Finally, considering the uncontested findings of fact as a whole, we conclude that they lead more naturally and rationally to the hearing officer's recommendation that Heimer should be retained than to the board's decision that she should be terminated.

Hence, the recommendation of the hearing officer is affirmed, and the cause is remanded to the board of education with directions to reinstate Heimer to her position as a full time, non-probationary teacher with no loss to her of any pay, seniority, or other employment benefits which she might otherwise have sustained as a result of the board's decision.

DAVIDSON and TAUBMAN, JJ., concur.